23944

GREENVILLE COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent v. Lynette BOWES and James Kent Godwin, Of Whom Lynette Bowes is Appellant. In the Interest of Cricket BOWES, DOB: 09-25-85, child under the age of eighteen years. Shirley Jean HALL and Roger Dale Hall, Respondents v. GREENVILLE COUNTY DEPARTMENT OF SOCIAL SERVICES, Lynette Bowes and James Kent Godwin, Of Whom Lynette Bowes is the Appellant. In the Interest of Cricket Joy BOWES, DOB: 09-25-85.

(437 S.E. (2d) 107)

Supreme Court

*Andrew M. Jones, Jr., Legal Services Agency of Western Carolina, Inc.,* Greenville, *for appellant.*

*Roger Dale Hall* and *Shirley Hall, pro se.*

*Tana G. Vanderbilt, SCDSS,* Columbia, *for respondent DSS.*

*Debora Faulkner,* Greenville, *guardian ad litem, for the child.*

Heard Nov. 5, 1993.

Decided Oct. 25, 1993. Reh. Den. Dec. 7, 1993.

MOORE, Justice:

This appeal involves the termination of appellant's (Mother's) parental rights in her seven-year-old daughter, Cricket, and Cricket's adoption by her foster parents, respondents Shirley and Rodger Hall.[1] We reverse the termination of parental rights and remand for a determination of custody.

---

[1] The child's father's parental rights were terminated with his consent and no issue is presented on appeal regarding the father.

*FACTS*

Mother was pregnant with Cricket in February 1985 when she was hospitalized in Virginia for treatment of a schizophrenic disorder. In July 1985, her condition was evaluated as improved with minimal impairment and she was considered capable of self-support. Upon her discharge from the hospital she moved to South Carolina to live with Cricket's father, James Kent Godwin.

On September 2, 1985, Mother gave birth to Cricket in Greenville Memorial Hospital. At that time, Godwin informed Mother she could no longer live with him and offered to take her to a local shelter after her discharge from the hospital. The shelter was not equipped to house babies nor did Mother have the appropriate supplies to care for an infant. A city juvenile officer came to the hospital and took Cricket into emergency protective custody on September 4. Respondent Greenville County Department of Social Services (DSS) then petitioned for emergency protective custody. Mother did not consent.

After a removal merits hearing, the family court issued an order on October 18, 1985, finding that DSS acted with probable cause in removing the child and awarding DSS custody. No finding of abuse or neglect was made. A treatment plan was ordered including psychiatric care for Mother. Cricket was placed in foster care with the Halls.

Soon thereafter, Mother purchased a mobile home for herself with disability income from social security. She began attending regular therapy sessions at the Greenville Mental Health Commission.

During this period, Mother's discussions with her therapist indicate she experienced repeated frustration in her dealings with DSS. Mother found her limited access to her child very unsatisfactory. She responded to the situation with apathy although she continuously expressed in therapy her desire to be reunited with Cricket. The therapist noted Mother's passivity and inability to communicate. He also noted the depth of Mother's feeling for Cricket: "Guilt, anger, feelings of betrayal and not being with Cricket and that period not with her can never be made up—not breastfed nor being loved now."

In 1987, Mother gave birth to another daughter, Victoria. Mother told her therapist she constantly worried DSS would

take Victoria from her. She was also very discouraged about the prospects of regaining custody of Cricket. DSS was not satisfied with Mother's progress under the treatment plan and her visitation was further restricted in 1989. Mother then brought an action to gain custody of Cricket. This action was unsuccessful.

In September 1989, DSS commenced an action to terminate Mother's parental rights in Cricket based on an alleged failure to visit with the child. By order dated November 9, 1989, Judge Board found DSS failed to prove the alleged ground for termination. He noted Mother had successfully cared for her other daughter, Victoria, since her birth and he specifically commented on DSS's evidence that there was a lack of bonding between Mother and Cricket: "This is natural since [Mother] and Cricket have had limited contact since the child was two days old. The court is convinced that [DSS] contributed to this lack of bonding by its failure to reunite [Mother] with Cricket." He ordered DSS to begin an earnest effort to reunite the family.

A third child, Phillip Aaron, was born in the spring of 1990. By July 1990, Mother had resumed physical custody of Cricket and on March 1, 1991, she was awarded legal custody.

On March 11, 1991, DSS filed a petition for protective custody based on reports Cricket came to school with "a very red area on the right side of her face," an "abrasion" on her left cheek, and "several bruises" on her shoulders and abdomen. After a removal merits hearing, Judge Mobley issued an order finding Mother had physically abused Cricket and granting DSS custody. He ordered a treatment plan including mental health counseling and visitation. Cricket was returned to foster care with the Halls.

Meanwhile, on May 10, 1991, Judge Mobley granted the Halls' motion to intervene in the removal action. They filed a pleading seeking permanent custody of Cricket or, in the alternative, termination of Mother's parental rights and an award of adoption to them. DSS joined in their request.

A termination hearing was held in September 1991 while DSS was still working with Mother on the treatment plan ordered by Judge Mobley. Judge Johnson found Mother's parental rights should be terminated pursuant to S.C. Code

Ann. § 20-7-1572(1) and (6) (1985). He awarded adoption to the Halls.

## ISSUES

1. Whether intervention by the Halls was proper.
2. Whether the statutory ground for termination was proved by clear and convincing evidence.

## DISCUSSION

Mother contends the family court abused its discretion in allowing the Halls to intervene to seek termination of her parental rights.

An action to terminate parental rights need not be initiated by DSS but may be brought by any interested party. *In re Lyle*, 284 S.C. 419, 327 S.E. (2d) 70 (1985); S.C. Code Ann. § 20-7-1564 (1985). Foster parents have standing to bring such an action. *Department of Social Services v. Pritchett*, 296 S.C. 517, 374 S.E. (2d) 500 (Ct. App. 1988); *see also* S.C. Code Ann. § 20-7-2376(E) (Supp. 1991) (foster care review board to advise foster parents of their right to petition the family court for termination of parental rights and adoption). A petition for removal may include a petition for termination of parental rights. S.C. Code Ann. § 20-7-736(F) (1985).

A decision allowing permissive intervention under Rule 24(b), SCRCP[2] will be reversed only for an abuse of discretion. *In re Milliken & Co.*, 295 S.C. 257, 368 S.E. (2d) 72 (Ct. App. 1988). Since foster parents have standing to seek termination and the statutory scheme allows removal and termination to be considered together, we find the family court did not abuse its discretion in allowing the Halls' intervention.

Mother next contends the evidence was insufficient to support a termination of her parental rights. Mother's parental rights were terminated pursuant to S.C. Code Ann. § 20-7-1572(1) (1985) which provides for termination when:

(1) The child or another child in the home *has been harmed* as defined in § 20-7-490(C), *and because of the severity or repetition of the abuse or neglect, it is not rea-*

---

[2] Applicable to family court under Rule 2, SCRFC.

*sonably likely that the home can be made safe within twelve months.* In determining the likelihood that the home can be made safe, the parent's previous abuse or neglect of the child or another child in the home may be considered. (Emphasis added.)

A ground for termination of parental rights must be proved by clear and convincing evidence. *South Carolina Dept. of Social Services v. Martell,* 279 S.C. 289, 307 S.E. (2d) 601 (1983). We conclude DSS and the Halls failed to prove by clear and convincing evidence that the severity or repetition of abuse or neglect makes it reasonably unlikely the home can be made safe within twelve months.

DSS and the Halls introduced no independent evidence the bruising in February 1991 was the result of abuse but submitted only the removal order which found physical abuse based on this incident.[3] No other abuse was alleged as a basis for termination. In a removal action, as opposed to a termination proceeding, abuse need only be shown by a *preponderance* of the evidence. *Aiken County Department of Social Services v. Wilcox,* 304 S.C. 90, 403 S.E. (2d) 142 (Ct. App. 1991). The finding of abuse in the removal order was therefore an insufficient finding of harm to support termination under a clear and convincing standard.

Moreover, in simply relying on Judge Mobley's finding of physical abuse in the prior removal order to terminate Mother's parental rights, Judge Johnson failed to make any determination the abuse was severe *or* repetitive as proved by clear and convincing evidence. Evidence the child came to school one day with the minor injuries described does not demonstrate severe abuse to justify termination of Mother's parental rights based on this single incident. While such physical abuse may constitute ground for removal of the child, it does not rise to the level of abuse required for termination.

Further, contrary to the dissent's assertion, there are no findings of abuse or neglect upon which to base a conclusion there was *repetitive* abuse or neglect to support termination. Cricket was removed from Mother at birth based on Mother's imminent inability to provide for her. Significantly, there

---

[3] Mother testified she was horseplaying with the child and accidentally bruised her.

never was any finding of abuse or neglect upon Cricket's removal at birth. *Cf.* S.C. Code Ann. § 20-7-610 (1985) (providing for emergency protective custody upon a finding of abuse or neglect).

Finally, DSS and the Halls failed to prove by clear and convincing evidence that "it is not reasonably likely that the home can be made safe within twelve months" as required for termination under § 20-7-1572(1). Mother was, *at the time of the termination hearing,* still in compliance with the DSS treatment plan ordered five months earlier. The DSS worker testified Mother had done everything requested of her throughout her dealings with DSS. Moreover, it is uncontroverted Mother has provided a good home for her other two children. Under the statute, this evidence is persuasive on the issue whether the home can be made safe. Mother also testified she wants Cricket back in her home.

The dissent would have us respond to the staggering statistics of child abuse and neglect by lowering the objective standards which must govern the termination of parental rights. This Court cannot sanction the precipitous termination of parental rights based on emotionally charged complaints not proved to the level of this objective standard. Further, we must recognize that Cricket too will suffer a tremendous deprivation if family ties are erroneously severed.

In 1982, the United States Supreme Court held for the first time that a parent's unfitness must be proved by *at least* clear and convincing evidence before his or her parental rights can be terminated. *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed. (2d) 599 (1982).[4] The Court's analysis in reaching that conclusion is instructive here. It commenced by noting:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced

---

[4] Following *Santosky,* this Court adopted a clear and convincing standard in termination cases. *Richberg v. Dawson,* 278 S.C. 356, 296 S.E. (2d) 338 (1982).

with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familiar bonds, it must provide the parents with fundamentally fair procedures.

455 U.S. at 753, 102 S.Ct. at 1394-95.

The Court also emphasized that a termination hearing pits the natural parent, *not* against the *child* but against the *State*. "[T]he State cannot presume that a child and his parents are adversaries. . . . until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." 455 U.S. at 760, 102 S.Ct. at 1398.

Further, the State marshals an array of public resources[5] and has the power to shape the historical events that form the basis for termination.[6] For instance, in this case, Mother has struggled through years of litigation fighting what must seem an overwhelming foe. DSS has had custody of Cricket for the child's entire lifetime and has contributed to the lack of bonding between Mother and her child.

Despite this disparity of power, the dissent would refuse Mother the constitutional protection set forth in *Santosky*. The dissent looks to other "complaints" of abuse never proved at all, much less proved by clear and convincing evidence, to establish repetitive abuse or neglect. Even more incredibly, the dissent wishes to support the termination of Mother's parental rights under subsection (2) of § 20-7-1572, a ground *never pleaded or raised* to the family court. In applying the due process clause to a termination case, *Santosky* clearly prohibits termination on a ground without notice. Even respondents concede the family court erroneously terminated Mother's rights under subsection (6) of § 20-7-1572 since no notice was given of that ground.

In sum, the evidence to support the statutory ground for termination does not rise to the level of proof by clear and convincing evidence. The main thrust of the evidence is in fact to demonstrate that the Halls are loving and responsible fos-

---

[5] 455 U.S. at 759, 102 S.Ct. at 1398.
[6] 455 U.S. at 763, 102 S.Ct. at 1400.

ter parents. While this Court's paramount concern is to ensure the child's welfare, we must in the process afford Mother the constitutional protection to which she is entitled. Moreover, we recognize the child's shared interest in preventing an erroneous termination of her familial bond with her natural parent. Accordingly, we reverse the termination of Mother's parental rights under § 20-7-1572(1) for failure to prove this statutory ground by clear and convincing evidence.

Further, we reverse the termination of Mother's rights under § 20-7-1572(6) since, as conceded, she had no notice of this ground for termination. Our disposition in this matter does not affect the issue of custody which is hereby remanded to the family court for consideration.

Reversed and remanded.

CHANDLER and FINNEY, JJ., concur.

TOAL, J., and HARWELL, CJ., dissenting in separate opinion.

TOAL, Justice dissenting:

I respectfully dissent. I disagree with the majority's position that the harm which initially required the removal of the child from the home must be reproved under the enhanced burden of proof of clear and convincing evidence. Additionally, I would hold the record before us adequately supports affirming the family court's termination of parental rights under section 20-7-1572, subsection 2.

In 1874, a New York City social worker discovered Mary Ellen Wilson chained, beaten, and starved by her adoptive parents. As there were no laws specifically addressing the abuse of children by their caregivers, the New York City police refused to take action. Through the efforts of Henry Berg, the founder of the Society for the Prevention of Cruelty to Animals, Mary Ellen's adoptive mother was brought to trial and Mary Ellen was placed in an orphanage,[1] The Society for the Prevention of Cruelty to Children was founded in 1875. Currently, all fifty states have laws and agencies to protect children from abuse and neglect. Yet, child maltreatment continues to plague our society to an alarming degree. Approxi-

---

[1] Edward Zigler & Nancy W. Hall, *Physical Child Abuse in America: Past, Present and Future*, in Child Maltreatment 38 (1989).

mately 2,694,000 children were reported as abused or neglected in the United States in 1991.[2] There were 17,847 child abuse reports in South Carolina.[3] Nationwide there has been a 274% increase of reported cases of child abuse and neglect since 1976.[4] Over 1,000,000 cases of child abuse and neglect are officially identified in the United States every year.[5] It is estimated that for every case identified, there are at least two more that are not reported.[6] This increase is attributable only partly to an increased awareness and reporting.[7]

In 1991, an estimated 1,383 children died from child abuse or neglect in the United States.[8] Currently, almost four children die in this country each day from abuse or neglect.[9] In South Carolina, twenty-two children's deaths were attributed to child abuse or neglect in 1991.[10] In 1992, figures are expected to show an increase to twenty-five deaths.[11] The rate of child maltreatment fatalities has risen steadily over the past six years.[12] In South Carolina, comparing the past three years with the previous three-year period, there has been a 32% increase in child deaths from abuse and neglect with many more deaths attributed to violence.[13] Indeed, "[i]t is increasingly dangerous to be a young child in South Carolina."[14] Between

---

[2] American Humane Association reporting the results of a survey conducted by the National Committee for the Prevention of Child Abuse.

[3] South Carolina Department of Social Services Central Registry, 1990-1991 Fiscal Year.

[4] American Humane Association, *Building an Aware and Caring Society.* (Hereinafter *"Caring Society".)*

[5] *Id.* Neglect in the most frequent form of maltreatment experienced by children. National Center on Child Abuse and Neglect, Working Paper 1, 1990 Summary Date Component.

[6] *Caring Society, supra* note 4.

[7] National Center on Child Abuse Prevention Research, Current Trends in Child Abuse Reporting and Fatalities: Results of the 1991 Annual Fifty-State Survey [hereinafter "Fifty-State survey"]. Economic stress abuse are the two most-often cited reasons for the actual increase in child abuse. *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.* These fatality figures probably under count the actual incidence of maltreatment fatalities as research consistently has shown that some accidental deaths, child homicides, and Sudden Infant Death Syndrome cases might be labeled more appropriately as child maltreatment deaths. *Id.*

[11] Fran H. Zupan, *Abuse, neglect deaths rising,* The State, Feb. 6, 1993, at 2B (quoting Catherine C. Cristophillis, Chairwoman of the Child Fatalities Review Committee, South Carolina Department of Social Services).

[12] Fifty-State Survey, *supra* note 7.

[13] Zupan, *supra* note 11.

[14] *Id.*

1989 and 1991, 39% of the victims whose deaths were identified as being the result of child abuse had prior or current contact with child protection services.[15]

Those child victims who survive abuse and neglect have a higher incident of psychiatric illness,[16] alcoholism,[17] and drug addiction.[18] Seventy to ninety percent of all prisoners were abused as children.[19] Child abuse and neglect tend to produce juvenile delinquency.[20] However, parental rejection appears to be an even more powerful instigator of crime.[21] In South Carolina, juvenile arrests for violent crimes rose 97% from 1987 to 1991.[22]

The prevalence and severity of child abuse and neglect in the United States is a national scandal. In the most abundantly endowed and progressive of the family of nations, the generational cycle of child abuse pervades much that is wrong with our culture. Problems of governmental ethics, the savings and loan debacle, and the economy make the headlines, while the darker side of life in America mostly is hidden from public view.[23] The disintegration of the American family has as great an impact on rising violent crime in this country as any single factor. All too often, children who are victims of abuse and neglect grow up to become the violent and dysfunctional in society. The court system rightly is criticized for failing to

[15] Fifty-State Survey, *supra* note 7. This substantial percentage, however, may in part reflect the fact that many states only investigate deaths of children with current or prior contact with protective services. *Id.*

[16] Jeffery B. Bryer, Bernadette A. Nelson, Jean Baker Miller & Pamela A. Krol, *Childhood Sexual and Physical Abuse as Factors in Adult Psychiatric Illness*, Am. J. Psychiatry 144:1426-30 (1987); Elaine Carmen, Patricia Perri Reiker & Trudy Mills, *Victims of Violence and Psychiatric Illness*, Am. J. Psychiatry 141:149 (1988).

[17] Melodie R. Schaefer, Karen Sobieraj & Rebecca L. Hollyfield, *Prevalence of Childhood Physical Abuse in Adult Male Veteran Alcoholics*, 12 Child Abuse and Neglect 141-140 (1988).

[18] Frederick S. Cohen & Judianne Densen-Gerber, *A Study of the Relationship Between Child Abuse and Drug Addiction in 178 Patients: Preliminary Results*, 6 Child Abuse and Neglect 383-387 (1982).

[19] *Caring Society*, *supra* note 4.

[20] Joan McCord, *A Forty Year Perspective on Effects of Child Abuse and Neglect*, 7 Child Abuse and Neglect 265-270 (1983).

[21] *Id.*

[22] South Carolina State Law Enforcement Division.

[23] Reports of child maltreatment involving day care centers and foster care homes attract a great deal of attention from the media and the general public. However, day care and foster care abuse reports account for less than 1% of all reports. Fifty-State Survey, *supra* note 7.

intervene quickly and effectively in abuse and neglect cases. This case is a perfect example of a child "caught in a system" of procedural delays. Cricket's mother has been completely unable or unwilling to care for Cricket during her seven years on this earth. Nevertheless, the majority sets forth a rule which requires that even though the courts have determined on three occasions that Cricket is not safe with her mother, each subsequent hearing will have to litigate all over again the Mother's neglect before this child can be freed for adoption.

Section 20-7-1572 of the South Carolina Code sets out six separate grounds which will support the termination of parental rights. Subsection 1 provides that parental rights may be terminated if the child has been harmed as defined under section 20-7-490(C), and because of the severity *or repetition of the abuse or neglect,* it is not reasonably likely that the home can be made safe within twelve months. Subsection 1 further provides that "[i]n determining the likelihood that the home can be made safe, the parent's previous abuse or neglect of the child or another child in the home may be considered." S.C. Code Ann. § 20-7-1572(1) (1985). The majority holds the harm under section 20-7-1572(1) must be reproved under a clear and convincing standard. Under the majority's analysis, all previous abuse and neglect also would be required to be re-litigated and proven by clear and convincing evidence. To construe section 20-7-1572(1) in this manner ignores the basic grounds under which the termination is allowed under this subsection, which is that the abuse or neglect is so severe *or repetitive* that it is not likely the home will be made safe in the next twelve months. The severity *or repetition* of the abuse or neglect is the basis for the termination of the parent's rights under this subsection, and, therefore, is the finding which must be established by clear and convincing evidence under *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed. (2d) 599 (1982).

Under the majority's analysis, it would be more difficult to terminate the rights of a parent who repeatedly has neglected or abused his child over a course of years than it would be to terminate the rights of a parent who fails to support his child for a six-month period under section 20-7-1572(4). This would illogical and certainly not the intent of the legislature. Fur-

ther, this interpretation is at odds with the legislature's mandate:

> This subarticle [dealing with termination of parental rights] must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and control of their parents by terminating the parent-child relationship. The interests of the child shall prevail if the child's interest and the parental rights conflict.

S.C. Code Ann. § 20-7-1578 (1985).

The majority's focus is solely on the rights of the Mother. No consideration is given to the child's interest or rights. Nor does the majority acknowledge the State's urgent interest in the welfare of the child. *Lassiter v. Department of Social Services,* 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed. (2d) 640 (1981). This, unfortunately, is also the position the United States Supreme Court took in *Santosky, supra.* In *Santosky,* the majority held the child and the parent's interest in keeping the family unit intact coincide, until the State proves parental unfitness. As pointed out by Justice Renquist's dissent, the child's interest in a continuation of the family unit exists only to the extend that such a continuation would not be harmful to him or her. *Id.* 455 U.S. at 787, 102 S.Ct. at 1413, n. 13. Assuming the child's interest is best served by keeping the family unit intact at this point ignores the very nature of the proceeding and the findings of the previous hearing.

If the child's interests are not adequately provided for by the procedure, and I would opine based on the majority's interpretation of our statute they are not, a change is in order. As noted above, the state of the child in this country and this state is a disgrace. The parents are protected to the utmost extent but the children, who cannot reasonably offer any protection of their own, are ignored. If our state and federal constitutions do not protect our children from abuse and an unstable family life in their formative years, then they should be amended so that they do. In a law review article, Judge Gill exposes the desperate situations children find themselves in because of this country's biological bias. The Honorable Charles D. Gill, *Essay on the Status of the American child, 2000 A.D.: Chattel or Constitutionally Protected Child-Citi-*

*zens?*, 17 Ohio N.U.L. Rev. 543 (1991). In his article, Judge Gill notes protection for children is included in the constitutions of seventy-nine countries. Sadly, the United States is not one of the seventy-nine. Judge Gill presents the proposed constitutional amendment drafted by the National Task Force for Children's Constitutional Rights. The first section of the proposed amendment provides:

> All citizens of the United States who are fifteen years of age or younger shall enjoy the right to live in a home that is safe and healthy; the right to adequate health care; the right to an adequate education and the right to the care of a living family or a substitute thereof, which approximates as closely as possible such a family.

*Id.* at 506.

Apparently without such a constitutional mandate expressly conferring the rights most of our children take for granted, a growing number of our youth must do without. In termination of parental rights hearings, the children who have the most to lose remain without a voice.

But the majority goes even further than is required by *Santosky*. It has imposed a near impossible standard for the long-term abusive parent. In this case, there was little evidence as to the severity of the physical abuse which necessitated Cricket's most recent removal from her mother's care. However, there was abundant evidence of the repetitive nature of the abuse and neglect to sustain a finding based on clear and convincing evidence that the home is not likely to be made safe in the next twelve months.

Cricket was born in 1985. Within a few days of her birth, she was taken into protective custody. At that time, it is undisputed that her mother was not capable of caring for her. She was placed in a foster home. Through DSS's intervention, the Mother eventually was given visitation rights which included overnight visitation when the child was two years old. This unsupervised visitation had to be discontinued, however, because of the Mother's strange behavior, which included allegations of physical abuse. At that time, supervised visitation was provided; however, the Mother was unhappy with this form of visitation and therefore chose not to visit the child at all for the next two years. After the two-year period of having

no contact with that child, the Mother nevertheless success-fully resisted DSS's attempt to terminate her parental rights. Visitation was resumed and eventually the Mother gained custody of five-year-old Cricket for the first time in the child's life. Within weeks of DSS's closing the case, however, DSS received complaints that Cricket again was being physically abused by her mother. The physical abuse subsequently was proved in a proceeding prior to the one before us. That order was not appealed from and is the law of the case. *Long v. Carolina Baking Co.*, 193 S.C. 225, 8 S.E. (2d) 326 (1939). Custody again was returned to DSS. Since that time, supervised visitation and counseling have been resumed. Although the Mother attends the scheduled visitations, she almost completely ignores Cricket during the supervised visitations.

The fact that the Mother has bonded with her other children and appears to be taking care of them is not dispositive. This Mother has been given every opportunity to care for Cricket. She openly admits she does not feel toward Cricket the way she does for her other children. She has told the DSS counselors that Cricket's feelings do not matter. She has allowed Cricket's half sister to hit Cricket and tell Cricket she is not part of their family. She also told Cricket's foster mother, before the most recent episode of physical abuse, that she planned on sending Cricket to live with her biological father. In my opinion, the repetitive nature of the Mother's neglect and abuse clearly and convincingly was established by the evidence. Accordingly, I would affirm the trial court's termination of parental rights.

Further, I would affirm the family court's termination of the parental rights of the Mother under section 20-7-1572, subsection 2. Subsection 2 allows for termination of parental rights if "[t]he child has been removed from the parent pursuant to § 20-7-736, has been out of the home for a period of six months, and despite a reasonable and meaningful effort by the agency to offer appropriate rehabilitative services, the parent has not remedied the conditions which caused the removal. . . ."[24] This provision allows for termination if the par-

---

[21] The majority objects to the termination based on this ground as it was not specifically pled. First, no specific statutory grounds were pled. Furthermore, alleged due process violations require some showing of prejudice. *Tall Tower, Inc. v. South Carolina Procurement Review Panel*, 294 S.C. 225, 363 S.E. (2d)

ent has not remedied the situation. It "does not suggest that attempt to remedy alone is adequate to preserve parental rights. The attempt must have, in fact, remedied the condition." *S.C. Dept. of Social Services v. Broome*, 307 S.C. 48, 413 S.E. (2d) 835 (1992) (quoting *Dept. of Social Services v. Pritchett*, 296 S.C. 517, 374 S.E. (2d) 500 (Ct. App. 1988), *cert. denied*, 298 S.C. 313, 380 S.E. (2d) 430 (1989)).

Cricket was removed from her mothers home most recently in March of 1991. Six months later, this hearing was held to determine if the parental rights of the Mother should be terminated. At this hearing, there was abundant testimony regarding DSS's efforts to provide services to rehabilitate the Mother and reunite her with her child. The majority places great reliance on the testimony that the Mother has complied with the treatment plan. The majority completely ignores the testimony which indicates her compliance has been limited to appearing at the scheduled sessions and following only the direct and repeated demands of the DSS counselors and caseworkers. The undisputed testimony indicates Cricket, although obviously fearful of her mother, has tried to establish a relationship with her. After Cricket's removal, the Mother spent the first visit interrogating Cricket to find our where DSS had placed her. Since that time, over a six-month period, the Mother has attended the scheduled visitations but almost complete disregards Cricket's presence. The Mother spends her time straightening the DSS office and talking with the caseworkers, but not even referring to Cricket. During one session, the Mother refused to accompany Cricket to the rest room until the caseworker absolutely insisted. When the Mother's other daughter is present at the supervised visitations, the Mother spends the entire visitation period reading or playing with the other daughter. Cricket spends the visitation period playing alone or doing her homework on the other side of the visitation area. Moreover, the Mother receives child support payments from Cricket's father even though she does not have custody of the child. She spends very little on Cricket and only then in response to the caseworker's requests.

---

683 (1987). The facts supporting termination under this provision were presented below. The Mother had an opportunity to rebut these facts but failed to convincingly do so. The majority's reliance on form over substance is consistent with its failure to recognize the rights of the child.

It is also undisputed there was absolutely no bonding between the Mother and child. The Mother has not shown any signs of affection to Cricket. The Mother consistently refused to recognize that any problems exist and has completely resisted all attempts made by the counselor to modify her behavior in any way. The Mother has demonstrated no desire to be a real, loving parent to Cricket. The Mother testified that she had no problem with Cricket's being in foster care, but that she did not want Cricket to continue to be placed with the adoptive parents. Since Cricket was removed, the Mother has not sought to regain custody. She has openly declared Cricket's feelings are unimportant to her. Attending counselling sessions in body only is not enough to remedy the abuse which necessitated Cricket's removal. DSS is not required to return Cricket to her mother's home and allow her to be abused again in order to prove the situation has not been remedied. It is painfully clear that the mother has no feelings for Cricket, but sees this litigation as a power struggle between DSS, the foster parents, and herself. Accordingly, the record supports termination of the Mother's parental rights on the basis that the conditions which necessitated removal have not been corrected in spite of DSS's efforts.

> Only a child who has at least one person whom he can love, and who also feels loved, valued, and wanted by that person, will develop a healthy self-esteem. He can then become confident of his own chances of achievement in life and convinced of his own human value. Where this positive environmental attitude toward an infant is missing from the start, the consequences become obvious in later childhood and adult life. They take the form of the individual's diminished care for the wellbeing of his own body, or for his physical appearance and clothing, or for his image presented to his fellow beings. What is damaged is his love and regard for himself, and consequently his capacity to love and care for others including his own children.[25]

The law provides for a strong presumption that the natural parent is that person. However, when it becomes clear the

[25] Joseph Goldstein, Anna Freud & Albert Solnit, *Beyond the Best Interest of the Child* 20 (1979).

natural parent cannot or will not fill this role, the law must provide the child with the opportunity for receiving what he or she needs through others. The record before this Court clearly and convincingly establishes the Mother has had every opportunity to nurture Cricket but repeatedly has failed to do so. Accordingly, her parental rights appropriately were terminated.

HARWELL, C.J., concurs.