2293

SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent v. James BROWN, Appellant and Mattie Mae Brown, Respondent-Appellant, and Jenea Brown, a Minor Respondent.

(454 S.E (2d) 335)

Court of Appeals

■■■■■■

*C. Bradley Hutto* of *Williams & Williams,* Orangeburg, *for appellant.*

*Zipporah O. Mapp,* Orangeburg, *for respondent-appellant.*

*Elizabeth K. Stricklin* of *S.C. Dept. of Social Services,* Columbia, *for respondent.*

*Cynthia B. Berry,* Orangeburg, *guardian ad litem.*

Heard Dec. 7, 1994.

Decided Jan 23, 1995.

*Per Curiam:*

This is an appeal from a Family Court order terminating the parental rights of James and Mattie Mae Brown to their daughter Jenea Brown based on a finding that Jenea's sibling was harmed as defined in § 20-7-490(C),[1] and because of the severity of the abuse and denial of wrongdoing, it is not reasonably likely that the home can be made safe within twelve months. Both parents appeal. We affirm as to the father James Brown and reverse and remand as to the mother Mattie Mae Brown.

Jenea Brown was taken into emergency protective custody by the Department of Social Services (DSS) on February 18, 1993 after her only sibling, Janella, died in the family home at age three months.[2] The autopsy performed on Jenella indicated multiple new and old healing fractures, bruises and wounds, and concluded that Janella died due to "battered

---

[1] *See* S.C. Code Ann. § 20-7-490(C) (1985) (defining "harm").

[2] At the time of Janella's death, Jenea was fifteen months old.

child syndrome."[3] As a result, the Orangeburg County Department of Social Services immediately took Jenea into protective custody and placed her in a foster home to protect her from any risk of suffering similar injuries or death. Both Mr. and Mrs. Brown were criminally charged for the death of Janella the week prior to the family court hearing concerning the termination of their parental rights, which was over five months after her death.

At the time of Janella's death, the family lived with Mrs. Brown's mother, Louise Morton, in Eutawville, S.C. Mrs Brown worked at American Yard Products in Orangeburg as a seasonal part-time employee. She was at work at the time of Jenella's death. Mr. Brown was unemployed and the primary caretaker of the children. When interviewed after Janella's death, he told the DSS caseworker that he put Janella on his lap on a pillow and patted her on the back to get her to sleep. One of her arms then fell limp. He checked for a pulse and could not find one. He then called his mother-in-law, put Janella in a bassinet, and went to the store to call EMS. While waiting for EMS to arrive, Mr. Brown stated he attempted mouth-to-mouth resuscitation and a cousin, who smelled of alcohol, attempted CPR. EMS transported Janella to MUSC by medivac helicopter. Janella was pronounced dead at MUSC.

During the interview with DSS,[4] Mr. Brown denied that Jenella's death could have been a homicide. He denied ever hitting the baby or doing anything to harm her. Furthermore, he denied ever seeing scars or bruises on Janella, even though

---

[3] Dr. Clay Nichols, the forensic pathologist who performed the autopsy on Janella, testified that multiple healing fractures in various stages of healing evidenced a chronic injury as well as a recent injury. This led to the diagnosis of battered child syndrome. More specifically, Janella died because multiple rib fractures destroyed her capacity to breath properly. The condition is commonly known as "flail chest." Dr. Nichols also testified that Janella probably died within three hours of the time the most recent fractures were inflicted. Furthermore, he stated the scratches and scars on the child's body certainly would be easily observed by a caretaker of the child and the injuries to the rib area would have been very painful, causing the child to cry out whenever picked up or moved around.

[4] DSS only interviewed the parents once, on the day following Janella's death. No psychological testing, home study or treatment plan was ordered in this case. The DSS caseworker testified she "didn't feel the need to follow up." Instead, she opined that based on the severity of the abuse and the denial of wrongdoing by the parents, no rehabilitation was possible.

he said he bathed Janella during the week while his wife worked. In fact, he could give no explanation for Janella's injuries except that maybe EMS had caused her death by administering CPR.

Mrs. Brown also denied seeing any scars on Janella except a small scar on her back which she claims she thought was a birthmark. Mrs. Brown did, however, engage in a regular pattern of taking her children to the doctor. She took Janella to her pediatrician, Dr. Way, on December 15th, 1992 for a rash and on January 8th, 1993 because she was crying excessively. Dr. Way's records do not indicate any suspicions of abuse at that time. In fact, Dr. Way attributed the excessive crying to constipation. Mrs. Brown testified she never suspected the crying could be from someone beating Janella. Dr. Way requested that Janella come back to his office one to two weeks after her December 15th visit, but the Browns failed to keep the appointment. Dr. Way again asked that Janella be rechecked two weeks after her January 8th visit. Mrs. Brown blamed Mr. Brown for not taking her back as scheduled. Therefore, January 8th, 1993 was the last time a doctor saw Janella before her death on February 17th, 1993. When asked if Janella cried out in pain when picked up or handled after the second doctor visit, Mrs. Brown said no.

At the family court hearing, Mrs. Brown presented witnesses who testified as to her good character and fitness as a mother. None of them had ever seen her act abusively toward either girl. In particular, Johnnie Louise Shuler, an R.N. from Family Health Center who works with pregnant women, testified Mrs. Brown had been very receptive to prenatal care with both daughters. Mrs. Shuler terminated her case with Janella in December because "I did some home visits to make sur everything was going fine . . . [a]nd things were looking good."

The guardian ad litem provided additional information about the Brown family. The guardian, like Mrs. Brown, described the Browns' marriage as on-again/off-again due to Mr. Brown's unemployment and habit of staying out all night. On inspection of the home she found no evidence of children's toys; however, some were stored in a trailer behind the house. Mr. Brown admitted drinking beer and using marijuana at least as recently as January, 1993. He had a nervous condition

and served two and a half years for robbery. The guardian reported both Mrs. Brown and Mrs. Morton told her they were afraid of Mr. Brown, and that he had stolen money from them. The guardian described Mr. Brown as the dominating person in the household.

Mrs. Brown told the guardian many times, as she did in court, that she was unaware of who caused the death of Janella. Mrs. Morton told the guardian she had seen Mr. Brown hit Janella too hard on the back while burping her and asked him to stop. Significantly, Mrs. Morton, not Mrs. Brown, demanded that Mr. Brown leave the home. According to Mrs. Brown, she separated from Mr. Brown after he lamented that "he's sorry to put me and my mother through these changes." However, she testified at the hearing that she was not afraid of her husband and would not be afraid for him to be around Jenea. In fact, though they had separated, Mrs. Brown said she still loved Mr. Brown and does not believe that he harmed Janella.

The guardian stated in her report that although a physical examination had not revealed any signs of abuse to Jenea, she, as well as the Foster Mother, had observed Jenea's fear of any adult male.[5] The guardian concluded that Jenea's behavior patterns demonstrated some sort of emotional and/or physical abuse. However, the guardian went on to state that due to Mrs. Brown's willingness to attend counseling, her continued financial support and visits to Jenea while in foster care, and the lack of evidence that she abused either child, it was premature to terminate Mrs. Brown's parental rights.[6] The trial court, nevertheless, granted the termination of parental

---

[5] After Janella's death, Jenea was examined and there was no evidence of injuries or abuse.

[6] In her report and recommendations to the court, the guardian ad litem stated:

> Based on my interviews with Mrs. Brown and others pertinent to this case, I am presently not in favor of the DSS recommendation of Termination of Parental Rights of Mrs. Brown. I believe it would be premature to terminate Mrs. Brown's parental rights until she has received a psychological evaluation to determine if her personality is predisposed to conceal or underestimate danger to her child, and to determine her parenting capabilities. Unless it is determined that she cannot be adequately protected, I feel Jenea deserves the right to be with her own mother. . . .

rights of both Mr. and Mrs. Brown, finding the parents "either singly [sic] or both, inflicted severe injuries upon Janella Brown . . . eventually resulting in her death . . . [and] because of the severity of the abuse and . . . denials [of wrongdoing], the home cannot be made safe within twelve (12) months."

On appeal, the mother contends the evidence was insufficient to support a termination of her parental rights. She argues there was no direct evidence to link her to any abuse, and DSS inadequately investigated this case. We agree that the termination of Mrs. Brown's parental rights was premature, and we find that the family court erred in terminating her parental rights because the record lacks clear and convincing evidence to support the termination.

Mrs. Brown's parental rights were terminated pursuant to S.C. Code Ann. § 20-7-1572(1) (1985) which provides for termination when:

> (1) The child or another child in the home has been harmed . . . and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months. In determining the likelihood that the home can be made safe, the parent's previous abuse or neglect of the child or another child in the home may be considered. . . .

A ground for termination of parental rights must be proved by clear and convincing evidence. *Greenville County Dep't of Social Services v. Bowes*, 313 S.C. 188, 190, 437 S.E. (2d) 107, 110 (1993) ("This Court cannot sanction the precipitous termination of parental rights based on emotionally charged complaints not proved to the level of this objective standard"); *see also South Carolina Dep't of Social Services v. Broome*, 307 S.C. 48, 52, 413 S.E. (2d) 835, 838 (1992) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed. (2d) 599 (1982) (U.S. Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.").

In reviewing a termination of parental rights, the appellate court has the authority to review the record and make its own findings of whether clear and convincing evidence supports the termination. *South Carolina Dep't of Social Services v. Humphreys*, 297 S.C. 118, 374 S.E. (2d) 922 (Ct. App. 1988). "Statutes providing for the termination of parental rights are to be strictly construed in favor of the parent and the preservation of the relationship of parent and child." *Leone v. Dilullo*, 294 S.C. 410, 413, 365 S.E. (2d) 39, 40 (Ct. App. 1988) (citing *Goff v. Benedict*, 252 S.C. 83, 165 S.E. (2d) 269 (1969)). However, the interest of the child shall prevail if the child's interest and the parental rights conflict. S.C. Code Ann. § 20-7-1578 (1985); *see also South Carolina Dep't of Social Services v. Vanderhorst*, 287 S.C. 554, 340 S.E. (2d) 149 (1986) (Because the "best interests of the child" were served by the termination of parental rights, the court refused to reverse the trial court's finding of termination).

The trial record is void of clear and convincing evidence to support the termination of Mrs. Brown's parental rights. On the date of Janella's death, Mrs. Brown was at work. Medical testimony revealed that Janella's fatal injuries were "recent" ones which occurred as little as three to four hours prior to her death. Mrs. Brown was the breadwinner of her family, and she worked over 10 hours a day in Orangeburg, thirty miles away from her home in Eutawville. She entrusted the care of her two children to her husband and her mother. Although medical testimony indicated multiple rib fractures in various stages of healing which should have been detectable because they should have caused Janella to cry excessively, there was no clear evidence Mrs. Brown was responsible for or ignored this situation. In fact, Mrs. Brown had earlier responded to Janella's excessive crying by taking her to her pediatrician who did not detect any injury to the child, but, instead, attributed the excessive crying to constipation.

There was not testimony indicating Mrs. Brown had ever abused either child. The DSS caseworker testified she didn't "have any information as to who inflicted the injury to [Janella]"; however, DSS's position "is that Mr. and Mrs. Brown as parents of this child had custody, care and control of the child." This alone, however, is not a sufficient basis for the

termination of Mrs. Brown's parental rights absent clear evidence that she either participated in or acquiesced in the abuse, or had knowledge of it.

Furthermore, DSS failed to prove by clear and convincing evidence that "it is not reasonably likely that the home can be made safe within twelve (12) months" as required for termination under § 20-7-1572(1). We concur in the guardian ad litem's observation that a termination of Mrs. Brown's parental rights would be "premature." After Jenea was placed in DSS custody, Mrs. Brown visited her regularly, paid child support and took clothes to her. Additionally, the guardian ad litem's investigation revealed that Mrs. Brown was making a genuine effort to create a more stable home environment for Jenea and herself. She separated from her husband, and testified she would enforce a court order denying Mr. Brown contact with Jenea. Clearly, "the home" the trial judge concluded could not be made safe within 12 months included the presence of Mr. Brown. If that were the case, we would hasten to agree that such a home cannot be made safe for Jenea. However, "the home" that Mr. Brown asks the court to consider excluded Mr. Brown and the evidence is not clear and convincing that it cannot be made safe for Jenea within 12 months.

Although we recognize that "a parent does not have the privilege of inflicting brutal treatment upon each of his children in succession before they may individually obtain the protection of the state," *Matter of T.Y.K.*, 183 Mont. 91, 598 P. (2d) 593 (1979), we are also cognizant of the U.S. Supreme Court's admonition that "the State cannot presume that a child and his parents are adversaries . . . until the State proves parental unfitness, the child and [her] parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760, 102 S.Ct. at 1398.

After careful consideration of the record, we do not find clear and convincing evidence to support a termination of Mrs. Brown's parental rights. While this Court's paramount concern is to ensure the child's welfare, we must in the process afford Mrs. Brown the constitutional protection to which she is entitled. *Bowes, supra.* Accordingly, we reverse the termination of Mrs. Brown's parental rights and

remand to the Family Court for a determination of what steps should be taken to ensure the safety and well-being of Jenea while maintaining a legal relationship with Mrs. Brown. Pending that determination, Jenea shall remain in DSS custody. Finding it in the best interest of Jenea that the parental rights of Mr. Brown be terminated we affirm the termination of his parental rights.[7]

Affirmed in part, reversed and remanded in part.

SHAW, CURETON and GOOLSBY, JJ., concur.

---

[7] During oral argument counsel for Mr. Brown indicated that Mr. Brown did not want to detrimentally impact Mrs. Brown's chances of regaining custody of Jenea, and he would abandon his appeal if necessary to preserve Mrs. Brown's relationship with Jenea.