THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 South Carolina Department of Social Services, Respondent,
 v.
 Tina Jean N., Clifford S., and John Doe,  of whom Tina Jean N. is Appellant.
 
 
 

Appeal From Pickens County
 Alvin D. Johnson, Family Court Judge

Unpublished Opinion No. 2007-UP-221
Submitted May 1, 2007  Filed May 14, 2007    

AFFIRMED

 
 
 
 Scott David Robinson, of Pickens, for Appellant.
 Scarlet Moore, of Greenville, for Respondent.
 Michael Anthony Andrews, of Easley, and Tara S. Taggart, of Columbia, for Guardian Ad Litem.
 
 
 

PER CURIAM: Tina Jean N. (Mother) appeals from the family courts order terminating her parental rights to her minor child based on a finding that the child was harmed and it is not reasonably likely that the home can be made safe within twelve months.  We affirm.[1]
FACTS
Mother and Clifford S. (Father) were never married; however, their relationship produced a child.  The child, born in December 2001, has always remained in the custody of Mother.  Father exercised very limited visitation with the child.  In October 2004, he sought to increase his visitation with the child.  
On February 7, 2005, Father picked the child up for the childs first overnight visit with Father.  While in Fathers custody, the child was taken to a farm where Father frequently worked.  The child was seen getting up off the ground with a bull calf running away.  It was assumed the calf had kicked the child.  Father did not take the child to a doctor for any medical care.  On February 8, he returned the child to Mother.   
Mother examined the child after learning about the possible incident with the calf and found a quarter size bruise.  The child was sore, but behaved normally.  The following day, Mother took the child to a previously scheduled ENT visit for follow-up regarding an ear infection.  Dr. Brown noticed numerous bruises to the childs face and lower arms.  Mother explained the bruises were caused when the child was trampled by the calf.  Dr. Brown noted his suspicion of abuse, but indicated he did not believe it was the situation.   
On February 10, 2005, Father again picked the child up for an overnight visit.  He kept the child until February 12, when he returned the child to Mother.  Father believed the time to be 12 to 12:30 p.m. when he returned the child.  Mother believed it was between 2 and 2:30 that afternoon.  When the child was returned, Mother found the child had been burned on its arm and back.  Father explained the burn occurred when the child fell into a bath of exceedingly hot water.  
At 3:39 Mother called her family doctor, Dr. Ardis.  During the conversation, she relayed the fact the child had bruising that was getting worse and that the child had been burned.  Dr. Ardis instructed her to take the child to the emergency room at Palmetto Health Baptist in Easley.  The child arrived at the hospital at approximately 4:00 p.m. with life threatening injuries.  
 The child had five broken ribs; a bucket handle fracture of her forearm; internal bleeding around her liver and adrenal gland; second degree burns to her arm; burns to the left side of her abdomen; scabs on her face and ear; areas behind her ear where hair had been pulled out; slash burns to her face; a massive bruise to her buttocks; a one-inch tear to her perineum; and numerous other bruises, scars, and scabs throughout her body.  The child required a blood transfusion due to the massive injuries she sustained.  Also found was a loop scar, which is emblematic of abuse by whipping with a belt or cord.  Due to the extreme injuries, the child was air lifted to Greenville Memorial Hospitals Pediatric Intensive Care Unit (PICU).  
The child was taken into protective custody and a probable cause hearing was held on February 14.  The child remained in the hospital for thirteen days, until February 25, when the child was placed with a foster care home.  The Department of Social Services (DSS) brought this action for termination of parental rights (TPR) against Mother and Father on the ground that the child has been harmed as defined in section 20-7-490, and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months.  Hearings were held over multiple days which resulted in extensive testimony regarding the injuries sustained by the child.
Dr. Michael Avant, a pediatric critical care physician that treated the child at Greenville Memorial Hospital, testified to the childs terrible injuries.  He explained that several of the injuries were older than a week, and others were inflicted within forty-eight hours of the child arriving at the hospital.  He also testified the child was in pain when she arrived and needed significant pain management.   
Dr. Avant stated he learned the reasons given by the parents for the injuries were the child fell into a hot bath causing the burns and was kicked by a calf causing the bruising.  Dr. Avant explained the injuries suffered by the child were not consistent with falling in a tub or being kicked by a calf.  He testified the injuries were nonaccidental.  
Dr. Avant averred the child would have been in obvious need of immediate medical attention from the number and extent of injuries.  Regarding Mothers delay in seeking medical care after the child was allegedly returned home at 2:00 in the same condition he witnessed at the hospital, Dr. Avant opined:  This child obviously needed medical attention immediately.  You know, to me these were impressive injuries that should have resulted in alarm.  Any delay I would have to question.  
In discussing some of the specific injuries, Dr. Avant stated he believed the tear to the childs perineum was caused by something being forced into the child or either a very severe straddle injury, neither of which would be consistent with a kick by a calf.  He testified some of the scars on the childs legs looked like cigarette burns that were more than a couple days old.  Finally, he testified the burns on the childs arm and abdomen clearly were not caused by a fall into a tub of water, but instead looked like it [was] poured down her. 
Dr. Nancy Henderson, the medical director of the trauma center at Greenville Hospital System, testified she reviewed the childs medical records and found the previous fifty-one visits to physicians to be concerning.  She was surprised Mother would not have taken the child to see a doctor after the alleged incident with the calf given Mothers history of reporting a wide variety of ailments.   
Dr. Henderson was bothered by the amount and frequency of doctors visits as well as whether a true need existed for some of the childs medications.  She was also very concerned that maybe some of the symptoms that [were] being shared to the physicians were not there.  Dr. Henderson testified that because the child was later doing so well without any medication, there was concern that either the ailments did not exist or were being exaggerated.  Finally, she opined Munchausen by Proxy was a real possibility as an explanation for the complete resolution of the childs medical problems once the child was removed from Mothers care. 
Dr. Lori Carnsew evaluated the child after she was removed from the parents and again shortly before the hearing on May 16, 2005.  She stated the child was healing and was no longer taking the medications she was prescribed while in Mothers care.  Additionally, she stated: There are no signs currently of any illnesses.  
Next Dr. Carnsew testified regarding a couple of the childs injuries.  She testified there were areas behind the childs ears where hair was missing and either slowly growing back or still missing.   She stated the only explanation for the missing hair was that it was pulled out.  Finally, she testified the child had a looped scar on her back.  She testified a looped scar is pretty much a hallmark of child abuse and its made with an electrical cord or some kind of cord being folded in half and used as a whip.  
Ann Moser, a nurse in the PICU, testified the child was in excruciating pain and had to receive morphine due to her injuries.  Moser recounted statements made by the child which were admitted pursuant to section 19-1-180 of the South Carolina Code.  Several asked, you know, what happened or if she had a boo-boo or whatever.  And at one point she had said, My momma did it.  Mommy did it.  
Moser opined that the injuries suffered by the child were not at all consistent with being kicked or trampled by a calf or resulted from a fall.   Moser testified the injuries were, in her experience, the result of abuse.  In addressing Mothers delay in seeking medical care from 2:30 until 3:39, Moser stated unequivocally:  Anything longer than one minute or two minutes to look at her, I believe would have been neglect.  
 The child also made statements to three additional nurses while in Greenville Memorial Hospitals PICU.  Caroline Cullinane testified the child told her Mommy did it when she was asked about her hurt arm.  Jenny Rohr testified the child told her that my mommy caused the boo-boo on her belly and nose.  When asked about her arm, Rohr stated the child told her that her mommy and daddy did it.  Brenda Dawley, the third nurse, explained:  I said, how did you get that owie on your nose? . . . And she answered me, Mommy.  Dawley then continued:  And I said, did your  Your mommy did that? And she said, Yes.  I said, Well, why would she do that? And she said, Because she hates me.
 Mother also presented several witnesses.  Mothers father testified that Mother and the child have a loving relationship.  He further testified that the child called most women mama if the child heard someone else call them by that name.  Several witnesses testified the child was a happy, cheerful girl that was well cared for by Mother and had a great relationship with Mother.  
Denise Sudlek, a friend of Mother and formerly a registered nurse, testified the bruises and other injuries were not visible when she saw the child the week before February 12.  She also stated she was the person who recommended Mother keep a journal of bruises and scrapes the child received because then Mother would be able to show the doctor how things happened and the doctor could help determine if something was wrong.  However, on cross-examination, she admitted having concerns about the number of doctor visits to which the Mother took the child.  Additionally, Sudlek was worried about the behavior of the child in which the child would repeatedly get up from the table to tell her mother that she loved her.  Sudlek explained, based on her experience, the behavior occurred because the child was either very insecure because of things that were going on around them or that they were being abused.  Finally, in discussing the testimony that the child indicated Mommy was the one that hurt her, Sudlek offered that children as young as the child dont know how to lie.  
Dr. Karen Ardis, a family practice physician in the office in which the child was routinely seen, testified she received the call from Mother at 3:39 p.m. that the child had been hurt.  Dr. Ardis described the call:

 She said she was calling about [the child] that she had been kicked by a calf several days ago and had bruising.  She then said that the bruising she thought was getting worse.  And she said, yes, it is worse.  Its open and draining now.  Then she said, but Im not calling about the bruising, [the child] had fallen into a tub of hot water exceedingly hot water and burned herself.  She said and some of them look like they are second degree burns and Im not sure what I should do.  

Dr. Ardis advised Mother to take the child to the hospital.  She testified if Mother waited more than five minutes after seeing this child to seek medical assistance then it would be medical neglect.  
Mother reiterated the claim that the child was kicked by a calf around February 7 while in the custody of Father.  She also stated Father told her the child fell into a bath of exceedingly hot water, which caused the burns.  She then asserted the child was not crying, though she was hurting, when Father brought her home on February 12.  Mother examined the child, became frantic, and gathered items to take with the child to the hospital.  Mother also stated the child played with her toy lawn mower and climbed onto the sofa to rest.  Mother stated it was immediately after viewing the child and gathering the childs blanket and doll that they headed out to the doctor.  She stated it was after she had left the home that she called Dr. Ardis.  
Fathers parents testified the child ate breakfast on February 12 before she returned home to Mother.  However, the childs paternal grandfather testified he did not run a bath the night the child allegedly fell into a bath of hot water.  He also stated he did not know the child had been burned until later.  
The Guardian ad Litem testified the child has been healing and doing well since being removed from Mothers custody.  She testified the child is no longer on the many medicines prescribed while in Mothers custody, nor is she suffering from any of the ailments such as chronic vomiting, asthma, or lactose intolerance. 
 The guardian also testified regarding some of the childs behaviors since she was placed into protective custody.  She stated the child would hit her doll and when asked why she would say because the baby peed in its pants.  In addition, the guardian testified the child has never asked for her mother or shown signs of being homesick in the months she has been out of Mothers custody.  Finally, the guardian testified unequivocally that the termination of Mothers parental rights was in the best interest of the child. 
The court issued a very detailed thirty-one page order in which the court recounted the testimony of the experts and other witnesses.  The court found there was clear and convincing evidence Mother harmed the child as defined in section 20-7-490 of the South Carolina Code (Supp. 2005).  In addition, the court found clear and convincing evidence that because of the severity and repetition of the abuse it was unlikely the home could be made safe. The family court determined it was in the childs best interest that Mothers parental rights be terminated.  The court then ordered the parental rights of Mother be terminated and the child be placed in the custody of DSS.  This appeal followed.
STANDARD OF REVIEW
Section 20-7-1578 of the South Carolina Code (Supp. 2006) mandates that the TPR statutes must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the custody and control of their parents by terminating the parent-child relationship.  See also Joiner v. Rivas, 342 S.C. 102, 536 S.E.2d 372 (2000) (overruling prior cases calling for strict construction of the TPR statutes).  In a termination of parental rights case, the best interests of the child are the paramount consideration.  South Carolina Dept of Soc. Servs. v. Smith, 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct. App. 2000).  The interests of the child shall prevail if the childs interest and the parental rights conflict.  S.C. Code Ann. § 20-7-1578.  Grounds for termination of parental rights must be proven by clear and convincing evidence.  South Carolina Dept of Soc. Servs. v. Headden, 354 S.C. 602, 608-09, 582 S.E.2d 419, 423 (2003) (citing Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).
Upon review, the appellate court may make its own finding from the record as to whether clear and convincing evidence supports the termination.  Headden, 354 S.C. at 609, 582 S.E.2d at 423.  The reviewing court, however, is not required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony.  Hooper v. Rockwell, 334 S.C. 281, 297, 513 S.E.2d 358, 367 (1999).
LAW/ANALYSIS
I.       Ground for Termination
Mother contends the family court erred in finding her parental rights could be terminated pursuant to section 20-7-1572(1) of the South Carolina Code (2005).  She maintains DSS failed to prove by clear and convincing evidence the abuse was at the hands of Mother and instead, the abuse only occurred during a single incident while the child was in the care and custody of Father.  Finally, Mother asserts there had been no repetitive abuse of any prior instances of abuse indicating Mothers home could not be made safe once Father was not involved.  We disagree.
Section 20-7-1572(1) states:

 The family court may order the termination of parental rights upon a finding of one or more of the following grounds and a finding that termination is in the best interest of the child:
 (1) The child . . . has been harmed as defined in Section 20-7-490, and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months.  In determining the likelihood that the home can be made safe, the parents previous abuse or neglect of the child or another child in the home may be considered . . . .

Child abuse or neglect or harm is defined as occurring:

 when the parent, guardian, or other person responsible for the childs welfare:
 (a) inflicts or allows to be inflicted upon the child physical or mental injury or engages in acts or omissions which present a substantial risk of physical or mental injury to the child, including injuries sustained as a result of excessive corporal punishment . . . .  

S.C. Code Ann. § 20-7-490(2) (2005).
Mother points to three cases to argue that DSS failed to prove the ground for termination by clear and convincing evidence.  First, Mother cites Greenville County Department of Social Services v. Bowes, 313 S.C. 188, 437 S.E.2d 107 (1993).  In Bowes, the court found DSS failed to prove the same ground alleged in the instant case because it failed to prove the child was abused by clear and convincing evidence.  The court found DSS never offered any evidence the bruising in February 1991 was the result of abuse but submitted only the removal order which found physical abuse based on this incident.  Id. at 193, 437 S.E.2d at 110.  However, this case is easily distinguished given the abundant evidence presented over multiple days regarding the severe abuse suffered by the child.     
Next, Mother points this court to South Carolina Department of Social Services v. Brown, 317 S.C. 332, 454 S.E.2d 335 (Ct. App. 1995), and Shake v. Darlington County Department of Social Services, 306 S.C. 216, 410 S.E.2d 923 (Ct. App. 1991).  In Brown, a child died while in the custody of the father and the mother was at work.  All evidence indicated the mother could not have played a role in the abuse that lead to the childs death.  Brown, 317 S.C. at 338, 454 S.E.2d at 338.  Additionally, no evidence was ever presented showing the mother abused the deceased child or other children in the home or neglected any child after it was previously abused by the father.  Id.  Finally, this court found the home could be made safe for the remaining children through the removal of the father, the only one shown to have abused the deceased child.  Id. at 339, 454 S.E.2d at 338-39.
In Shake, this court affirmed the family courts refusal to terminate the mothers parental rights when then only evidence in the record indicated the child was abused in a solitary incident involving excessive corporal punishment by the mothers boyfriend when the mother was not at home.  Shake, 306 S.C. at 220, 410 S.E.2d at 925.  As will be discussed below, the case at hand does not involve a single isolated incident or only one parent as abuser with the other parent being an innocent party based on the record.
Based on the horrific facts discussed above, the only conclusion that can be reached is that the child suffered extreme abuse and harm.  The testimony clearly indicates much of the harm originated at times when Mother was in full custody of the child.  First and foremost, the child identified mommy as the person that caused several of her injuries.  Four different witnesses testified the child told them that various injuries, from scabs on her face to arm injuries, were caused by Mother.  All witnesses testified the child was not capable of lying.  The testimony was admitted by the court pursuant to section 19-1-180 of the South Carolina Code (2006), and the admissibility of the testimony has not been challenged on appeal.
While some of the harm obviously occurred at the hands of Father, Mother was also abusive.  The loop scar was clearly a sign of prior abuse which did not originate while the child was in Fathers custody.  Other bruises, scabs, and scars were described by medical experts as older than two or three days, meaning that they likely occurred while in the custody of Mother. Moreover, the testimony by numerous individuals graphically detailed the childs injuries on February 12 and several experts testified it would have been impossible for the child to travel from Greenville to Easley in that condition.  Therefore, the above cases can be distinguished because there is clear and convincing evidence Mother abused the child.
In addition to the injuries detectible on February 12, there was evidence the abuse and neglect was ongoing for years.  Testimony by numerous medical personnel indicated it was likely Mother was manufacturing medical problems in order to seek treatment for the child.  In three years, the child was seen over fifty-one times by doctors.  The complaints ranged from acid reflux to asthma to chronic diarrhea and vomiting.  The child was placed on numerous medications to alleviate the symptoms, usually based in part on the histories given by Mother.  However, since being removed from Mothers custody, the symptoms have all resolved and the child has not required any of the prior medications.
Finally, even if many of the injuries resulted from events out of Mothers control, numerous witnesses testified it was medical neglect to delay the child receiving medical treatment.  If the story told by the parents is to be believed, many of these injuries occurred on February 7 at the latest.  To wait until February 12 to seek medical attention is clearly neglect.  Even if the injuries resulted from events prior to the child being returned to Mothers custody at 2:30 in the afternoon on February 12, to wait over an hour until 3:39 to seek any medical advice was inexcusable and in the testimony of many witnesses, including several defense witnesses, it was blatant medical neglect.  
The family courts thirty-one page order fully detailed the testimony and the evidence relied on in terminating Mothers parental rights.  Based on the voluminous record before us, we find there was abounding evidence supporting a finding by the family court that the child has been harmed as defined in Section 20-7-490, and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months.      
II.      Best Interest of the Child
Mother argues the best interest of the child are not served through TPR, but are served by being reunited with Mother.  We disagree.
In a termination of parental rights case, the best interests of the child are the paramount consideration.  South Carolina Dept of Soc. Servs. v. Smith, 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct. App. 2000).  If the parents and childs interests conflict, the childs interest prevails.  See S.C. Code Ann. § 20-7-1578.
The brutality of the abuse and the long term effects of the abuse are sufficient reasons to justify terminating Mothers parental rights.  Moreover, the child is thriving in her current situation.  After being removed from Mothers custody, the child has become free from numerous medications, which may not have been necessary.  In addition, the testimony indicates the child is healing, both emotionally and physically, from her injuries. Further, the guardian and others testified that the termination of Mothers parental rights is in the best interest of the child.  Therefore, it is clear from our reading of this record that the best interest of this child is served by terminating Mothers parental rights to the child.  
CONCLUSION
Based upon our own view of this record, we find clear and convincing evidence supports the family courts determination that Mother abused the child, the home could not be made safe, and termination of Mothers parental rights was in the best interest of the child.  Accordingly, the order of the family court is 
AFFIRMED.
HEARN, C.J., and GOOLSBY and KITTREDGE, JJ., concur.

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.