496 S.E.2d 864

**RICHLAND COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent,**

v.

**Venorris EARLES, Benny Richardson, and Herbert Gilmore,**

**Of whom Venorris Earles is the Appellant.**

**In the Matter of Perry Latisha EARLES, Essie Sylvester Earles, minors under the age of 18.**

**No. 24768.**

Supreme Court of South Carolina.

Heard May 20, 1997.

Decided Feb. 23, 1998.

James A. Merritt, of Berry, Adams, Quackenbush & Dunbar, Columbia, for appellant.

Richard G. Whiting, Columbia, for respondent.

Elisabeth C. Gallant, Columbia, for the guardian ad litem.

BURNETT, Justice:

Appellant, Venorris Earles (Mother), appeals the order terminating her parental rights. We affirm.

## *FACTS*

In February 1995, Richland County Department of Social Services (DSS) brought this action seeking to terminate Mother's parental rights. DSS also sought to terminate the parental rights of the children's fathers in this action. After the termination of parental rights hearing, the family court judge found Mother's parental rights should be terminated pursuant to S.C.Code Ann. § 20–7–1572(1) & (2) (1976 as amended) and the fathers' parental rights should be terminated pursuant to

S.C.Code Ann. § 20–7–1572(3) & (4) (1976 as amended).[1] The family court judge further found it was in the best interest of these children to terminate Mother's parental rights.

Mother is the biological mother of two children, a boy, Sylvester Earles, born July 1, 1987, and a girl, Latisha Earles, born November 12, 1988. The first report concerning this family was made on June 3, 1988 to DSS. This report was unfounded. On November 14, 1988, a second report was made to DSS (1988 incident). This report was indicated[2] and an in-home treatment plan was implemented. On March 7, 1989, the children were taken into emergency protective custody (1989 incident). Allegedly, Mother left the children for four days in the care of an elderly woman who could not adequately care for them. In the removal action, the family court judge found physical neglect. Mother completed a treatment program including parenting skills training at the Nurturing Center and a 29 day in-patient alcohol dependency program at the VA Hospital. The children were returned to Mother's custody on December 12, 1989. This case was closed on June 1, 1990. The services provided by the Nurturing Center were terminated on August 21, 1991.

On November 9, 1991, the children were again taken into emergency protective custody and they have remained in the custody of DSS since that date (1991 incident). Latisha had scars all over her body and a "gash" in her forehead at the time of the removal. According to the medical report, Latisha had stated her mother was responsible for the gash; Mother denies responsibility for the gash. Allegedly, Latisha was also locked in a closet and had been burned with cigarettes. Mother denied committing these acts; however, a witness for Mother admitted Mother had told her she had burned Latisha and locked her in a closet. Latisha was also severely malnourished. At the time of this second removal, Latisha, who was three years old, weighed less than 20 pounds. This

---

1. The fathers of the children, Benny Richardson and Herbert Gilmore, have not appealed the termination of their parental rights.

2. An indicated report "means a report of child abuse or neglect supported by facts which warrant a finding by a preponderance of evidence that abuse or neglect is more likely than not to have occurred." S.C.Code Ann. § 20–7–490(13) (Supp.1996).

weight was less than when Latisha was returned to Mother in December 1989. The medical report concludes Latisha's medical history indicates chronic abuse.[3] Mother only admits to not feeding Latisha for three or four days as a form of punishment. According to Mother's testimony she was sober when this incident occurred.

On April 29, 1992, Mother plead guilty to felony child abuse and was sentenced to six years in jail. Mother was released from jail on four years probation on March 1, 1993. Since the 1991 incident, Mother has constantly asked to be reunited with her children. The decision to terminate Mother's parental rights occurred in April 1992.[4] In July 1992, the Family Court ordered visitation between Mother and the children to cease because visitation was traumatizing the children and adversely affecting their progress. In November 1992, DSS was granted an order by the family court no longer requiring it to provide services to Mother. DSS had provided Mother extensive services following the 1988 and 1989 incidents; however, no services were offered following the second removal action in 1991. The only evaluation done was a court-ordered psychological evaluation performed in 1994. Neither DSS nor the children's guardian ad litem (GAL) attempted to determine whether Mother had rehabilitated herself since 1991 or attempted to evaluate her current status as a potential parent. Shortly after the 1991 incident, the GAL offered her services to Mother; however, Mother declined her help. On March 21, 1995, Mother met with the current DSS case worker. This case worker offered to secure services for Mother, but Mother declined. Further, the case worker testified she would have assisted Mother in obtaining services even though DSS had been relieved of the duty to provide services. Mother did participate in some courses while in prison. After leaving prison, Mother went to the Women's Shelter where she took several classes and received counseling. Many of these courses were mandatory. Further, the focus of these courses and counseling were on improving Mother and teaching her to be self-sufficient and not on abuse issues. Mother then moved

---

3. Sylvester appeared unharmed at the time of this removal.

4. No explanation was provided as to why DSS waited almost three years after this decision to start the termination of parental right action.

into transitional housing for two years. Mother has recently moved out of transitional housing. Mother admitted at the hearing she was not yet capable of caring for the children; however, she would like visitation.

While in foster care following the 1991 incident, the children reported they had been sexually abused by Mother. At the termination of parental rights hearing, Dr. Lois Wandersman, a clinical psychologist, who was qualified as an expert in sexual abuse, testified she had approximately 90 sessions with Sylvester and 50 sessions with Latisha beginning in May 1992 and ending November 1994. At the time Dr. Wandersman began seeing the children, both were showing serious behavior problems, including sexual acting out. The family court judge found the children were unavailable and the statements trustworthy pursuant to S.C.Code Ann. § 19-1-180 (Supp.1996). Therefore, over the objection of Mother, Dr. Wandersman was allowed to testify as to statements made by the children about the sexual abuse during the therapy sessions. According to Dr. Wandersman's testimony, in August 1993 Sylvester revealed Mother had been sexually abusing him and Latisha. Dr. Wandersman testified she found Sylvester's statements credible and did not believe the statements were coached. According to Dr. Wandersman, it is not unusual for children to delay disclosure of abuse for a long period of time. Dr. Wandersman testified Sylvester's behavior was consistent with sexual trauma. Dr. Felicia C. Myers, Coordinator for the Children Adolescent Family Program at Lexington County Medical Health Center where Sylvester was currently receiving treatment, testified she believed Sylvester had been sexually abused. Sylvester had not disclosed to Dr. Myers who committed the abuse. Mother denies any sexual abuse and has refused to obtain counseling for sexual abuse.

Sylvester continues in mental health care and suffers from severe problems including masturbation, touching adults on their breasts, getting on top of the foster mother while she is in bed, and going into his foster mother's room to see her change clothes. At the time of the hearing, DSS had no immediate plans for permanent placement for Sylvester. However, DSS hopes Sylvester will be placed after undergoing more treatment. Latisha has improved greatly since 1991 and Latisha's foster parents wish to adopt her.

## ISSUES

I. Did the family court judge err in admitting the children's hearsay statements into evidence under S.C.Code Ann. § 19–1–180 (Supp.1996)?

II. Were the statutory grounds, S.C.Code Ann. § 20–7–1572(1) & (2) (1976 as amended), for termination of parental rights proven by clear and convincing evidence?

## DISCUSSION

### I.

Mother claims the family court judge erred in admitting the children's hearsay statements into evidence under S.C.Code Ann. § 19–1–180 (Supp.1996), because the judge failed to make the necessary findings of unavailability and trustworthiness.[5] We disagree.

Section 19–1–180 provides out-of-court statements made by children concerning an act of abuse or neglect may be admitted in family court proceedings if the child testifies or the child's out-of-court statement is shown to possess particularized guarantees of trustworthiness and the child is found unavailable to testify on one of the following grounds:

(i) the child's death;

(ii) the child's physical or mental disability;

(iii) the existence of a privilege involving the child;

(iv) the child's incompetency, including the child's inability to communicate about the offense because of fear;

(v) substantial likelihood that the child would suffer severe emotional trauma from testifying at the proceedings or by means of videotaped deposition or closed-circuit television; and

S.C.Code Ann. § 19–1–180(B)(2)(a) (Supp.1996).

First, the family court judge was not required to make any findings concerning Latisha's unavailability or the trustworthiness of her statements. DSS did not attempt to elicit testimony from Dr. Wandersman of statements made by Latisha. Instead, Dr. Wandersman, on direct examination, only testi-

---

**5.** We note the scope of § 19–1–180 is not at issue in this case.

fied of statements made by Sylvester. Latisha's statements were admitted as part of Dr. Wandersman's affidavit which Mother offered into evidence. Thus, Mother cannot now complain of hearsay statements in that document attributable to Latisha.

■ The family court judge found the children unavailable to testify in person at the proceeding because of the likelihood the children would suffer severe emotional trauma. The judge determined she was not required to find the children would also suffer trauma if they testified by videotape or closed-circuit television. This was error. Unavailability under § 19–1–180(B)(2)(a)(v) requires a finding that the child will suffer severe trauma by testifying under all three methods.

■ However, the evidence in the record supports a finding that Sylvester would suffer severe trauma if forced to testify under any method. Dr. Wandersman testified Sylvester would suffer severe trauma by testifying under any method. Admittedly, because Dr. Wandersman had not seen Sylvester in a year, her opinion on this issue is suspect. However, Dr. Myers, who was treating Sylvester at the time of the hearing, also testified Sylvester would be severely traumatized, thus corroborating Dr. Wandersman's opinion. Dr. Myers also testified that Sylvester's reaction had been extremely severe the last time the topic of his mother was discussed. According to Dr. Myers, Sylvester became very angry and aggressive. Thus, although the family court judge erred, the evidence supports a finding that Sylvester would be traumatized under any circumstances.

■ Dr. Wandersman testified she found Sylvester's statements to be trustworthy and credible. Using the criteria set forth in § 19–1–180(D), the family court judge also found Sylvester's statements were trustworthy and credible. The judge found Dr. Wandersman to be a credible witness and the statements attributable to Sylvester were not coached. Further, Sylvester's description of the sexual abuse represented a graphic, detailed account beyond a child of Sylvester's age, knowledge and experience and demonstrated a personal knowledge of the abuse. Because the record contains evidence supporting the family court judge's findings and because findings concerning the trustworthiness of the

statements are a credibility issue, this Court will give great deference to the family court's determination on the issue of trustworthiness. *Aiken County Dep't of Social Services v. Wilcox*, 304 S.C. 90, 403 S.E.2d 142 (Ct.App.1991) (because appellate court lacks opportunity for direct observation of the witness, it should accord great deference to family court judge's findings where matters of credibility are involved).

## II.

### S.C.Code Ann. § 20-7-1572(1)

■ Mother contends the evidence was insufficient to support a termination of her parental rights under § 20-7-1572(1) because DSS failed to prove by clear and convincing evidence Mother's home could not be made safe within twelve months. We disagree.

S.C.Code Ann. § 20-7-1572(1) provides for termination when:

(1) The child or another child in the home has been harmed as defined in § 20-7-490(C), and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months. In determining the likelihood that the home can be made safe, the parent's previous abuse or neglect of the child or another child in the home may be considered.

A ground for termination of parental rights must be proved by clear and convincing evidence. *Greenville County DSS v. Bowes*, 313 S.C. 188, 437 S.E.2d 107 (1993). In reviewing a termination of parental rights, the appellate court has the authority to review the record and make its own findings of whether clear and convincing evidence supports the termination. *SCDSS v. Brown*, 317 S.C. 332, 454 S.E.2d 335 (Ct.App.1995).

In our opinion, the evidence clearly and convincingly supports termination of Mother's parental rights on this statutory ground. The evidence clearly and convincingly established the children had been harmed by Mother. According to Mother's testimony, she was the sole caretaker of these children and no one else could have abused Latisha or Sylvester. Latisha was severely malnourished. Contrary to Mother's

contention, it should take more than three or four days for a healthy three-year-old to reach the state of malnourishment Latisha had reached at the time of the removal. Mother's own testimony demonstrates the depth of Mother's cruelty in attempting to starve Latisha. According to Mother, while denying Latisha food, Mother forced Latisha to watch her brother eat. Further, the medical report, the pictures and the GAL's testimony demonstrated Latisha had been beaten and burned in addition to the malnourishment. In the medical report, which was admitted without objection, Latisha stated the gash on her head was caused by Mother hitting her. The GAL's testimony, also admitted without objection, corroborated the statement in the medical report. Even one of Mother's witnesses testified Mother had admitted to her that Mother had burned Latisha and locked her in a closet. The medical report concluded the abuse was chronic.[6] Thus, Latisha's condition was not the result of a one time incident.

The evidence also clearly established Mother was sexually abusing these children. Dr. Wandersman testified these children had been sexually acting out since removal in 1991 and their behavior was consistent with sexual abuse. Dr. Myers also testified Sylvester's behavior was consistent with sexual abuse and she believed Sylvester had been sexually abused. Sylvester told Dr. Wandersman Mother had been sexually abusing him and Latisha all their lives. Sylvester's description of the sexual abuse is graphic and detailed. Dr. Wandersman's testimony concerning statements made by Sylvester about the abuse are believable and Sylvester's statements do not appear coached. Thus, clearly Mother, repetitively and severely, physically and sexually abused these children.

Further, clear and convincing evidence established Mother's home could not be made safe. Although DSS did not provide Mother with any treatment after the 1991 incident, Mother had already received extensive parenting training on two prior occasions. Unfortunately, these treatment plans were not successful as demonstrated by the fact that the second removal occurred less than three months after Mother's association with the Nurturing Center was terminated. Further, these

---

6. Chronic means "lasting a long time or recurring often." *Webster's New World Dictionary* 254 (2d college ed. 1976).

children have been severely traumatized and the mention of their mother causes adverse effects on the children.

Contrary to Mother's contention, § 20–7–1572(1) does not require DSS to show Mother has failed to rehabilitate. Instead, DSS only has to show because of the severity or repetition of the harm, Mother's home cannot be made safe. This section does not require that DSS provide Mother with a second or third chance. Because of the severity and repetitive nature of the abuse and because Mother had received extensive parenting courses in the past, we find the family court correctly determined Mother's home could not be made safe for these children.

Therefore, we affirm the family court's order terminating Mother's parental rights under § 20–7–1572(1).[7]

### Best Interest of the Child

Mother further contends the family court improperly relied on the nonstatutory ground of best interest of the child to terminate Mother's parental rights. We disagree.

At the time of this hearing, the best interest of the child was not a statutory ground for termination of parental rights. *See Hopkins v. SCDSS*, 313 S.C. 322, 437 S.E.2d 542 (1993) (Chandler, A.C.J., concurring opinion). Here, the family court judge determined parental rights should be terminated pursuant to the statutory grounds set out in § 20–7–1572(1).[8] The family court judge then found, in an abundance of caution, termination was in the best interest of the children. The family court judge did not consider the best interest of the child as a ground for termination of parental rights.

**AFFIRMED.**

FINNEY, C.J., TOAL, MOORE and WALLER, JJ., concur.

---

**7.** Because we affirm under § 20–7–1572(1), we need not address Mother's argument that DSS failed to prove by clear and convincing evidence that Mother's parental rights should be terminated under § 20–7–1572(2).

**8.** We note, effective January 1, 1997, a family court judge is required to make the additional finding that termination is in the best interest of the child. S.C.Code Ann. § 20–7–1572 (Supp.1996).