336 S.C. 248 (1999)
519 S.E.2d 351
SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,
v.
Tashanda Nicole PARKER, Ben J. Cooper, Rico O'Brien Taylor, and John Doe, whose true name is unknown, and Rodricuv I'Keem Daqune Cooper, a/k/a Daquon Parker, DOB: April 7, 1993, and Deborah ReQonisha Taylor, DOB: May 3, 1994, of whom Rico O'Brien Taylor is the Appellant.
No. 3014.
Court of Appeals of South Carolina.
Submitted June 8, 1999.
Decided June 21, 1999.
Rehearing Denied August 28, 1999.
*251 George R. Sharwell, of Columbia, for Appellant.
Celeste Moore, of South Carolina Department of Social Services, of Columbia, for Respondent.
Laura Waring, of Columbia, for Guardian ad Litem.
ANDERSON, Judge:
Rico O'Brien Taylor (Father) appeals from an order of the Family Court terminating his parental rights as to his minor daughter, Deborah ReQonisha Taylor (Deborah). We affirm.[1]

FACTS/PROCEDURAL BACKGROUND
Father and Tashanda Nicole Parker (Mother) are the natural parents of Deborah ReQonisha Taylor, born May 3, 1994. Mother has another minor child, Rodricuv I'Keem Daqune Cooper a/k/a Daquon Parker (Rodricuv), born April 7, 1993. On April 12, 1993, the Richland County Department of Social Services (DSS) received a report that Rodricuv tested positive for syphilis and marijuana at birth. The report was substantiated. DSS referred Mother to the Lexington/Richland Alcohol and Drug Abuse Council (LRADAC) for treatment services, but Mother failed to follow through with the referral. Subsequently, DSS was informed that Deborah tested positive for syphilis at birth. DSS continued to offer Mother rehabilitative services, including drug abuse counseling at LRADAC.
On July 1, 1994, DSS was notified Mother was staying at a local motel and was using cocaine in the presence of the minor *252 children. Although Mother tested positive for cocaine on the same day, DSS elected not to take Deborah and Rodricuv into emergency protective custody. On August 9, 1994, DSS received a report alleging: (1) Mother had failed to seek necessary medical care for the children; (2) she was not providing proper infant care for the children; and (3) the family apartment and the children were in a dirty and unsanitary condition. The report was verified upon investigation. The Columbia Police Department took the children into protective services. By order dated September 14, 1994, the Family Court granted DSS custody of the children.
A merits hearing was held October 6, 1994. The Family Court found Mother had medically and physically neglected the children. The Court granted custody of the children to one of Mother's relatives. However, Mother's relative voluntarily relinquished custody to DSS on December 30, 1994. According to the relative, Mother was involved with drugs and was disrupting the relative's household. The children were thereafter returned to foster care and remain in that status. DSS had no contact with Mother from December 30, 1994 until February 8, 1995, when Mother called the DSS caseworker and reported she was still using drugs but wanted help. The next day, the DSS caseworker attempted to visit Mother at her last known address, but the home was vacant. As a result of a review hearing held March 2, 1995, the Court (1) relieved DSS of its obligation to offer Mother treatment services and (2) approved a termination of parental rights (TPR) and adoption plan.
On June 1, 1995, Mother visited the DSS caseworker at her office. The caseworker informed Mother about the TPR and adoption plan. Additional rehabilitative services were offered and Mother was notified that a Foster Care Review Board hearing was scheduled for June 7, 1995. During the meeting, Mother told the caseworker that Rico Taylor was Deborah's father, and he was incarcerated at the Richland County Detention Center on charges of drug trafficking. On the same day, the caseworker contacted the Richland County Detention Center to obtain information as to Father. She was informed Father was indeed incarcerated at the Richland County Detention Center.
*253 On June 6, 1995, the DSS caseworker mailed a letter to Father at the Richland County Detention Center informing him DSS was involved with Deborah and Mother had named him as Deborah's father. The letter included the caseworker's name and office number. The June 6, 1995, letter was not returned to the caseworker. On October 28, 1995, the caseworker sent a second letter to Father, inviting him to appear before the Foster Care Review Board. The October 28, 1995, letter was returned to the caseworker with a notation that Father was no longer at the Richland County Detention Center. The caseworker never spoke with Father. She received no correspondence from him.
DSS filed a summons and complaint on March 13, 1996, seeking TPR as to, among others, Father. He was personally served with the summons and complaint on March 22, 1996, at the federal penitentiary in Atlanta, Georgia, where he was incarcerated. In response, Father drafted a letter, dated March 23, 1996, opposing the termination. Although Father mailed the letter to the address provided on the summons, the letter was returned to him marked "Address Unknown." By order dated March 3, 1997, the Family Court appointed a guardian ad litem and an attorney for Father. On May 12, 1997, Father filed an answer denying his parental rights should be terminated.
The Family Court terminated the parental rights of both Mother[2] and Father after a TPR hearing on August 11, 1997. In support of its decision to grant TPR, the Court found Father had failed to visit or support Deborah. Specifically, the Court determined Father (1) had seen Deborah only once, when she was two months old; (2) had neither provided Deborah with financial support nor made any material contribution to her care; and (3) was arrested in July of 1994 on drug charges and incarcerated continuously since that time. Father contended he was unable, due to his incarceration, to perform his parental dudes, and he had made efforts to rehabilitate himself during his incarceration. However, the Court concluded any difficulties Father experienced due to being incarcerated resulted directly from his voluntary course of lawlessness. In holding TPR was in Deborah's best interest, *254 the Court noted, absent a successful appeal, Father's anticipated date of release is 2004. The Family Court terminated Father's parental rights. This appeal followed.

ISSUES
I. Is incarceration a reasonable excuse for failure to visit and support a child?
II. Was there clear and convincing evidence to support the termination of Father's parental rights?

STANDARD OF REVIEW
A ground for termination of parental rights must be proved by clear and convincing evidence. Greenville County Dep't of Social Services v. Bowes, 313 S.C. 188, 194, 437 S.E.2d 107, 110 (1993) ("This Court cannot sanction the precipitous termination of parental rights based on emotionally charged complaints not proved to the level of this objective standard"); see also South Carolina Dep't of Social Servs. v. Broome, 307 S.C. 48, 52, 413 S.E.2d 835, 838 (1992) (citing Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (U.S. Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence")).
In a termination of parental rights case, the appellate court has jurisdiction to review the entire record to determine the facts in accordance with its view of the evidence. Richland County Dep't of Social Servs. v. Earles, 330 S.C. 24, 496 S.E.2d 864 (1998). This Court may review the record and make its own findings as to whether clear and convincing evidence supports termination. Broome, supra.

LAW/ANALYSIS

I. Consideration of Incarceration
Father argues the Court erred in terminating his parental rights on the basis of his criminal misconduct and consequent incarceration, which he asserts are not statutory grounds for termination. We reject this contention inasmuch as it stems *255 from Father's misapprehension of the Family Court's order. Regarding Father's incarceration, the Family Court found:
Although [Father] contends he has been unable to perform his parental responsibilities due to his incarceration and that he has made efforts to rehabilitate himself during this time, he overlooks the important fact that his criminal conduct was voluntary and the true cause of his being unable to fulfill his parental responsibility.
However, a careful reading of the order leads to the ineluctable conclusion that Father's parental rights were terminated pursuant to S.C.Code Ann. § 20-7-1572(3) & (4) (Supp.1998). That section provides for termination where:
(3) The child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to visit the child. The court may attach little or no weight to incidental visitations, but it must be shown that the parent was not prevented from visiting by the party having custody or by court order. The distance of the child's placement from the parent's home must be taken into consideration when determining the ability to visit;
(4) The child has lived outside the home of either parent for a period of six months, and during that time the parent has wilfully failed to support the child. Failure to support means that the parent has failed to make a material contribution to the child's care. A material contribution consists of either financial contributions according to the parent's means or contributions of food, clothing, shelter, or other necessities for the care of the child according to the parent's means. The court may consider all relevant circumstances in determining whether or not the parent has wilfully failed to support the child, including requests for support by the custodian and the ability of the parent to provide support.
The Family Court properly considered Father's criminal misconduct and incarceration in determining whether or not Father had established a reasonable excuse for failing to visit or support Deborah. See Hamby v. Hamby, 264 S.C. 614, 216 S.E.2d 536 (1975) (wherein our Supreme Court affirmed a finding of abandonment where Father voluntarily pursued a course of lawlessness resulting in his imprisonment and inability to perform parental duties); See also South *256 Carolina Dep't of Soc. Servs. v. Phillips, 301 S.C. 308, 391 S.E.2d 584 (Ct.App.1990). We find no error.

II. Wilful Failure to Visit and Support
Next, Father asserts clear and convincing evidence does not support the Family Court's finding that he wilfully failed to visit and support Deborah. We disagree.
Whether a parent's failure to visit or support a child is "willful" within the meaning of § 20-7-1572 is a question of intent to be determined from all the facts and circumstances in each case. South Carolina Dep't of Soc. Servs. v. Broome, 307 S.C. 48, 52, 413 S.E.2d 835, 838 (1992). The trial judge is given wide discretion in making this determination. Id.; Bevis v. Bevis, 254 S.C. 345, 175 S.E.2d 398 (1970). However, the element of wilfulness must be established by clear and convincing evidence. Broome, supra; Richberg v. Dawson, 278 S.C. 356, 296 S.E.2d 338 (1982). A parent's conduct which evinces a settled purpose to forego parental duties may fairly be characterized as "willful" because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent. Hamby, 264 S.C. 614, 216 S.E.2d 536.
Father, who remained incarcerated at the time of trial, testified by way of deposition taken on August 8, 1997. In his deposition, Father admitted: (1) he had never contributed financially to Deborah's support and (2) he had not visited with her since she was approximately two months old. Father denied his actions were wilful in nature.
Regarding his failure to visit with Deborah, Father averred he had "the chance to hold her a couple of times after she was brought home." Father had no other contact with Deborah prior to his incarceration in July of 1994. According to Father, he was not aware Deborah had been taken into DSS custody until March of 1996, when he received the summons and complaint seeking termination of his parental rights.
Initially, we note the record indicates Father made no attempt to locate Deborah during the interim between his incarceration in July of 1994 and his receipt of the summons and complaint in March of 1996. Although Deborah was taken into protective custody in August of 1994, the DSS *257 caseworker was not informed of Father's identity and location until June of 1995. Immediately upon obtaining this information, the caseworker confirmed Father's whereabouts and mailed Father a letter informing him of Deborah's status at DSS. The caseworker admitted difficulty in corresponding with Father due to the fact he was frequently transferred from prison to prison. However, the June, 1995, letter was not returned to the caseworker as undelivered. The record is devoid of any evidence, save Father's own denial, that the June, 1995, letter did not reach its proper destination.
Father maintains he attempted to respond to the summons and complaint and obtain information about Deborah via a letter that was returned to him marked "Address Unknown." However, Father did not thereafter attempt to contact the attorney for DSS listed on the complaint. Further, though Father avers he enlisted the help of his mother and sister in determining Deborah's location after he received the summons and complaint in March of 1996, Father's sister testified he did not discuss his daughter until January or February, 1997. While Father's mother claimed she called DSS and was refused any information, her testimony indicates her inquiry was geared toward locating Deborah's mother, rather than obtaining information about whether Father could visit with Deborah. Father's mother arranged a meeting with Father's guardian ad litem, but forgot to attend the meeting and misplaced the guardian's number. The guardian ad litem was asked for an address where Deborah could be located, but the guardian was unable to obtain such information. Father failed to make any inquiry as to the name of Deborah's DSS caseworker or the correct address for the Richland County Department of Social Services.
Most tellingly, Father confirmed he was appointed a guardian and an attorney in March of 1997, but never requested either contact DSS on his behalf and arrange a visit with Deborah. Moreover, Father conceded DSS did nothing to prevent him from visiting with Deborah.
Specifically regarding his failure to support Deborah prior to his incarceration and the commencement of these proceedings, Father explained he was afraid to give Mother money or contribute materially because of her drug problem. Concerning *258 his failure to pay child support during the pendency of these proceedings, Father insists he did not know the site of Deborah until March of 1996. He further says DSS never notified him of his obligation to pay child support. However, Father was employed while incarcerated and earned between $30 and $35 per month. He spent the money he earned on cigarettes, personal hygiene products, and phone calls. The Court of Appeals addressed this issue in South Carolina Dep't of Soc. Servs. v. Phillips, 301 S.C. 308, 391 S.E.2d 584 (Ct.App. 1990):
The record supports the trial judge's finding that the purchase of canteen food and cigarettes while in prison were unnecessary expenses and Johnson's wages could not have been significantly depleted by the occasional purchase of soap and personal grooming supplies. We further find that Johnson's incarceration for an undisclosed offense did not relieve him of his duty to support his child.
Phillips, 301 S.C. at 310, 391 S.E.2d at 585.
While we recognize Father made limited efforts to find Deborah once he learned DSS intended to pursue termination of his parental rights, there is no evidence he or anyone acting on his behalf ever attempted to arrange for him to visit with Deborah during the course of these proceedings. To the extent Father experienced difficulty in corresponding with DSS due to his status as an inmate, we find his circumstances stemmed from his own actions. In addition, nothing in S.C.Code Ann. § 20-7-1572(3) & (4), as amended, requires a parent be "notified" of his duty to support or visit Deborah before failure to discharge those duties may serve as grounds for termination of parental rights.

III. Best Interest of the Child
Father maintains the Family Court TPR order is not supported by clear and convincing evidence. We disagree.
In a termination of parental rights case, the best interests of the children are the paramount consideration. South Carolina Dep't of Soc. Servs. v. Vanderhorst, 287 S.C. 554, 340 S.E.2d 149 (1986). Termination of parental rights statutes "must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the *259 custody and control of their parents by terminating the parent-child relationship. The interests of the child shall prevail if the child's interest and the parental rights conflict." S.C.Code Ann. § 20-7-1578 (Supp.1998). In Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the Supreme Court noted: "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." 441 U.S. at 397, 99 S.Ct. at 1770.
An enduring relationship is not present between Father and Deborah. Father has seen his daughter only once, when she was 2 months old. He will not see her again until she is ten years old. Had Father made a recognizable effort to visit with his daughter, or to provide support for her, there may have been evidence of an "enduring relationship." However, because he has wilfully failed to visit or support her, the Family Court is correct in finding termination of Father's parental rights in the best interest of Deborah.

CONCLUSION
We hold the record supports the Family Court's determination Father wilfully failed to visit with and support Deborah. We do not view Father's voluntary pursuit of lawless conduct, which resulted in his incarceration and limited ability to personally correspond with DSS officials, as a reasonable explanation of his failure to visit with and support Deborah. See Hamby v. Hamby, 264 S.C. 614, 216 S.E.2d 536 (1975) (affirming a finding of abandonment where Father voluntarily pursued a course of lawlessness resulting in his imprisonment and inability to perform parental duties); see also Department of Soc. Servs. v. Henry, 296 S.C. 507, 374 S.E.2d 298 (1988); South Carolina. Dep't of Soc. Servs. v. Phillips, 301 S.C. 308, 391 S.E.2d 584 (Ct.App.1990). Our own review of the record convinces us the Family Court correctly determined termination of Father's parental rights is in Deborah's best interest. To date, Deborah has been in DSS custody for nearly six years. As noted by the Family Court, her chances of being adopted continue to decrease as she grows older. We fully agree with the Family Court that Deborah's life "must not be put on hold until her father is *260 released from prison and thereafter becomes able to care for her." There is clear and convincing evidence in the record to support the order of the Family Court.
Accordingly, the decision of the Family Court is
AFFIRMED.
CURETON and STILWELL, JJ., concur.
NOTES
[1] Because oral argument would not aid the Court in resolving the issues on appeal, we decide this case without oral argument pursuant to Rule 215, SCACR.
[2] Mother is not a party to this appeal.