357 S.C. 371 (2004)
593 S.E.2d 175
SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Plaintiff,
v.
Carolina LEDFORD, James P. Berlin, and Leigha Berlin, DOB 02/02/93, Defendants.
Of Whom South Carolina Department of Social Services is, Respondent, and
James P. Berlin is, Appellant.
No. 3734.
Court of Appeals of South Carolina.
Heard December 9, 2003.
Decided February 2, 2004.
*373 Ziva Peleg Bruckner, of Augusta, for Appellant.
Dennis M. Gmerek, of Aiken, for Respondent.
Lark W. Jones, of N. Augusta, for Guardian Ad Litem.
HEARN, C.J.:
The South Carolina Department of Social Services (DSS) brought this termination of parental rights (TPR) action against Carolina Ledford (Mother) and James Berlin (Father). The family court terminated the parental rights of both parties, and Father appeals.

FACTS
In 1993, the parties' daughter, Leigha, was born. Three years later, Father was convicted of first-degree forgery and incarcerated in Georgia. Shortly thereafter, Father was paroled, and he received permission to work in South Carolina. At some point during 1998, that permission was revoked, and Father knew that if he continued to work outside the State of Georgia, he would be in violation of his parole. Despite this knowledge, Father continued working in South Carolina, and he was incarcerated for violating his parole. While Father was in prison, he and Mother divorced.
*374 Once divorced, Father lost contact with both Mother and Leigha. In 1999, Leigha was taken into emergency protective custody after Mother left her with friends in Hilton Head, supposedly for a day, and did not return after two weeks. Mother had a serious drug problem, and her whereabouts were unknown at the time of the TPR hearing.
At the hearing, Father testified that during the time he and Mother were together, she did not have a drug problem and was a good mother. He further testified that he was very active in his daughter's life, though he offered very few details.
Father admitted that while he was in prison, he attempted to contact Leigha on only two occasions. According to his testimony, his first attempt occurred when he asked prison officials to help him locate his daughter. When they did not help him, Father became frustrated and did nothing else. His second attempt occurred when he sent Leigha a birthday card by way of her older half-sister,[1] but the card was returned as undeliverable. According to Father's own testimony, no other attempts were made to contact his daughter.
DSS attempted to locate Father, but the only information it received from Mother was that he was incarcerated in Georgia. When asked if he did anything to aid in DSS's search for him, Father stated: "I remained breathing oxygen." Eventually, a caseworker found him through the Internet listings of the Georgia Department of Corrections, and in January of 2001, he was served with a summons and complaint to terminate his parental rights.
Even after learning of the TPR, Father failed to establish any contact with the caseworker or DSS. The caseworker testified that Father knew or should have known how to contact her or DSS from the time he received the summons and complaint in January of 2001. Father also made no attempt to contact the guardian for the minor child until after he was released from prison, about one week prior to the TPR hearing.
DSS sought to terminate Father's parental rights on the grounds that he abandoned his daughter, he willfully failed to *375 visit within the previous six months, and he willfully failed to provide support during the previous six months. Father denied the allegations.
The family court found that Father abandoned his daughter and that TPR was in the child's best interest. In making this finding, the family court explicitly stated that Father's testimony was without credibility and was completely self-serving. Father appeals.

STANDARD OF REVIEW
"A ground for termination of parental rights must be proved by clear and convincing evidence." Richland County Dep't of Soc. Servs. v. Earles, 330 S.C. 24, 32, 496 S.E.2d 864, 868 (1998) (citing Greenville County Dep't of Soc. Servs. v. Bowes, 313 S.C. 188, 437 S.E.2d 107 (1993)). "In reviewing a termination of parental rights, the appellate court has the authority to review the record and make its own findings of whether clear and convincing evidence supports the termination." Earles, 330 S.C. at 24, 496 S.E.2d at 868 (citing S.C. Dep't of Soc. Servs. v. Brown, 317 S.C. 332, 454 S.E.2d 335 (Ct.App.1995)).

LAW/ANALYSIS
Father maintains the family court erred both in finding that he had abandoned daughter and in finding that termination of his parental rights would serve her best interests. We disagree.
Pursuant to section 20-7-1572(7) of the South Carolina Code, the court can terminate the rights of a parent who abandons his or her child if termination of those rights is in the child's best interest. Abandonment occurs when "a parent or guardian willfully deserts a child or willfully surrenders physical possession of a child without making adequate arrangements for the child's needs or the continuing care of the child." S.C.Code Ann. § 20-7-490(19) (Supp.2002).
Willfulness is "a question of intent to be determined by the facts and circumstances of each case." S.C. Dep't of Soc. Servs. v. Wilson, 344 S.C. 332, 336, 543 S.E.2d 580, 582 (Ct.App.2001) (citing S.C. Dep't of Soc. Servs. v. Broome, 307 *376 S.C. 48, 52, 413 S.E.2d 835, 838 (1992)). "Our supreme court has defined willfulness as `[c]onduct of the parent which evinces a settled purpose to forego parental duties ... because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent.'" Id. (quoting Broome, 307 S.C. at 53, 413 S.E.2d at 839). "Generally, the family court is given wide discretion in making this determination. However, the element of willfulness must be established by clear and convincing evidence." Id.
Father argues that the only evidence of abandonment was his incarceration and that incarceration alone is insufficient to terminate his parental rights. We agree that pursuant to South Carolina Department of Social Services v. Wilson, incarceration alone is insufficient to justify termination. However, in Wilson, the incarcerated father made extensive efforts to maintain contact with his children, but DSS prevented the visitation. The Wilson court held: "The record contains overwhelming evidence that SCDSS not only refused to facilitate visitation, it actually took an active role in preventing the father from visiting his children. Despite the father's repeated requests, the caseworkers refused to allow visitation both at the correctional facility and after the review hearings." 344 S.C. at 338, 543 S.E.2d at 583.
In the instant case, aside from unsuccessfully sending Leigha a birthday card via her older half-sister, Father admitted he only attempted to locate his daughter one time and that his effort to find her ended when prison officials were unhelpful. Even after learning Leigha was in DSS's custody, Father made no attempt to inquire about her health and wellbeing. Father neither made arrangements for his child's care nor showed concern for the status of her current arrangements. Unlike the father in Wilson, Father made only a miniscule attempt to remain a part of his daughter's life while in prison. In addition to "breathing oxygen," Father was required to take the necessary steps to assure that his daughter was being continually cared for, and because he failed to do this, we find he effectively abandoned her. See S.C.Code Ann. § 20-7-490(19) (defining abandonment as the willful surrender of a child by a parent without making adequate arrangements for the child's continuing care).
*377 Father asserts that he did not abandon his daughter because he left her in Mother's care when he was initially incarcerated. However, based on the language of section 20-7-490(19), a parent's responsibility extends beyond making initial arrangements for his or her child while the parent is away; the statute requires that the parent make adequate arrangements for the child's continuing care. Thus, even if we believe Father's testimony that Mother had been a qualified caregiver at the time of his incarceration,[2] he had an ongoing responsibility to make efforts to ensure that his daughter was continually cared for while he was serving his sentence. Because Father willfully failed to either inquire about his daughter or verify that Mother was indeed taking care of her, we find no error in the family court's determination that Father abandoned his child. Furthermore, based on the lack of recent contact between Father and Leigha, the guardian ad litem's testimony that termination is in Leigha's best interest, and the foster mother's testimony about Leigha's current living situation, we agree with the family court that termination of Father's parental rights is in Leigha's best interest.
Father next argues that the family court judge's questions of him displayed bias. After having been examined and cross-examined by his attorney and the attorney for DSS, Father then fielded over thirty questions from the family court judge. While we believe this questioning was certainly excessive and unnecessarily harsh, we find that, ultimately, it did not adversely affect the outcome of the proceedings.
In Fowler v. Laney Tank Lines, Inc., 263 S.C. 422, 211 S.E.2d 231 (1975), the court reiterated "the sound and long established rule that `the trial judge, of course, has the right, in his discretion, and in a proper manner, to question witnesses during a trial, in order to elicit the truth.'" Id. at 425, 211 at 232 (quoting Williams v. S.C. Farm Bureau Mut. Ins. Co., 251 S.C. 464, 163 S.E.2d 212 (1968)). The foremost danger in a judge asking a witness questions is that the nature of the questioning might indicate to the jury how the judge *378 feels about a particular witness's testimony or how the case itself should be resolved. See, e.g., Williams v. S.C. Farm Bureau Mut. Ins. Co., 251 S.C. 464, 472, 163 S.E.2d 212, 216 (1968) ("If a trial judge in the exercise of his discretion feels called upon ... to question witnesses to elicit the truth, he should be cautious to see that such questions are propounded in a fair and impartial manner, and should not express or indicate to the jury the judge's opinion....").
In this case, the family court judge questioned Father at length about his incarceration and whether he accepted any responsibility for his daughter being in foster care. The judge repeated many questions even after receiving answers from Father. Although we believe the form of the judge's questions was adversarial and the number of questions was excessive, we also acknowledge that the family court judge was the fact-finder at this hearing; thus, the "foremost danger" of judicial questioning, i.e., tainting the jury, is not present in this case. Moreover, we find ample evidence in the trial record to support the family court judge's decision to terminate Father's rights. Accordingly, the family court's decision is
AFFIRMED.
HOWARD and KITTREDGE, JJ., concur.
NOTES
[1] Leigha's half-sister is Mother's daughter from a previous relationship.
[2] The family court judge discounted Father's testimony regarding whether Mother was a qualified caregiver at the time of Father's incarceration.