603 S.E.2d 867

### SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,

v.

**Michael TRUITT, Sandra Ivester, John Doe, Defendants,**

**of whom Michael Truitt and Sandra Ivester are, Appellants.**

**In the Interest of: Gabriel Truitt (DOB: 11–2–99), Elijah Truitt (DOB: 11–2–99), and Alexis Truitt (DOB: 12/11/00), Minors Under the Age of 18.**

No. 3873.

Court of Appeals of South Carolina.

Heard Sept. 14, 2004.

Decided Oct. 11, 2004.

274

Katherine H. Tiffany and Tracy Welsh Tiddy, both of Greenville, for Appellants.

Rebecca Rush Wray, of Greenville, for Respondent.

Carol Anne Simpson, of Greenville, for Guardian Ad Litem.

WILLIAMS, J.

Michael Truitt and Sandra Ivester appeal the termination of their parental rights. We affirm.

## FACTS

Sandra Ivester and Michael Truitt are the parents of three children—Gabriel, Elijah, and Alexis. Although the two have been romantically involved for eight years, they never married. When this action commenced, Gabriel and Elijah were eighteen months old and Alexis was six months old.

On June 10, 2001, Sandra took the children to have Sunday dinner at Michael's parents' house. After dinner, while San-

dra and her children were napping, Michael borrowed Sandra's car and went to visit friends. Later, he returned to the house and asked Sandra to accompany him as he dropped off his friends. Sandra agreed to go, left her children with their grandparents, and told them she would be back in approximately fifteen minutes.[1]

Sandra and Michael did not return home in fifteen minutes. In fact, they had not returned by the next morning. Because Michael's mother had to work and his father suffered from medical difficulties, neither was able to care for the children.[2] Having tried to contact Sandra and Michael numerous times, the grandparents were left with no option but to call the Department of Social Services ("DSS"). Corporal Miller, of the Mauldin Police Department, testified that when he arrived at the Truitt's home on Monday he made further attempts to locate the children's parents, but was unsuccessful. Lacking proper supervision, the children were taken into emergency protective custody.

After Sandra and Michael left his parent's house on Sunday, Michael allowed a couple of "friends" to borrow Sandra's car in exchange for $100.00 of crack cocaine. While the car was gone, both parents smoked the crack at another friend's apartment. Neither parent attempted to contact the grandparents until after DSS took custody of the children. When they finally did call Monday afternoon, they were informed that DSS removed the children.

Sandra testified she did not return on Sunday to pick up the children because Michael's friends never brought back the car. She also testified she did not call the grandparents because there was no telephone in the apartment where they were staying. Sandra explained that a number of Mauldin police officers lived in the area, and she was afraid if she left the apartment to find a telephone then she would be picked up on outstanding warrants.

---

1. Michael's mother, Sally Truitt, testified that she told the children's parents she had an engagement later that night, and both said they "would be back."

2. Sandra testified that she was aware of the circumstances and knew Michael's parents were unable to care for the children for an extended period of time.

Even though both were fully aware DSS had their children, for the next two months Sandra and Michael spent their time living in motel rooms and smoking crack every other day. They called Michael's parents from time to time to ask for money and talk about the children, but otherwise did not attempt to contact their children or DSS despite testimony that they knew the name of their caseworker. The authorities did not locate Sandra and Michael until they were arrested, living in a hotel, on August 14, 2001.

Following their arrest, Sandra did not request visitation with her children until the first week of October 2001. She cancelled the first scheduled visitation and did not actually meet with the children until October 25, 2001, more than four months after the children were left with their grandparents. Michael never contacted DSS to seek visitation or to check on the children's welfare. Thus, DSS initiated this termination of parental rights ("TPR") action on July 26, 2001.

At the time of the hearing, Sandra was released from jail and working in a family catering business. Although Michael was still incarcerated, he expected to be released from custody at the end of 2003. The children were placed with a foster family who expressed interest in adopting all three children.

Significantly, this was not the first time DSS became involved in the children's lives. In October 2000, Michael left Gabriel and Elijah—then eleven months old—home alone while he went to purchase illegal drugs. Sandra was incarcerated at the time and unable to watch the children. Accordingly, Gabriel and Elijah were taken into emergency protective custody. DSS filed an action concerning this incident and an Order was issued on February 21, 2001, which made a "finding of threat of harm of physical neglect" against Michael and ordered treatment plans for both parents. The order granted custody to Sandra, but only granted Michael supervised visitation. Although Sandra completed the treatment plans outlined in the order, Michael did not. The third child, Alexis, was born in December 2000; therefore, the previous court order did not address custody or visitation rights as they pertained to her.

## STANDARD OF REVIEW

 "In a termination of parental rights (TPR) case, the best interests of the children are the paramount consideration." *Doe v. Baby Boy Roe,* 353 S.C. 576, 579, 578 S.E.2d 733, 735 (Ct.App.2003) (citing *South Carolina Dep't of Soc. Servs. v. Smith,* 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct.App.2000)). Before a parent's rights may be terminated, the alleged grounds for termination must be proven by clear and convincing evidence. *Dep't of Soc. Servs. v. Mrs. H,* 346 S.C. 329, 333, 550 S.E.2d 898, 901 (Ct.App.2001).

 On appeal, this court may review the record and make its own determination of whether the grounds for termination are supported by clear and convincing evidence. *Id.; see also South Carolina Dep't of Soc. Servs. v. Cummings,* 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct.App.2001). However, despite this broad scope of review, this court is not required to disregard the findings of the family court nor ignore the fact that the trial judge was in a better position to evaluate the credibility of the witnesses and assign weight to their testimony. *Dorchester County Dep't of Soc. Servs. v. Miller,* 324 S.C. 445, 452, 477 S.E.2d 476, 480 (Ct.App.1996). This is especially true in cases involving the welfare of children. *Aiken County Dep't of Soc. Servs. v. Wilcox,* 304 S.C. 90, 93, 403 S.E.2d 142, 144 (Ct.App.1991).

## LAW/ANALYSIS

Under South Carolina's termination of parental rights statute, "[t]he family court may order the termination of parental rights upon a finding of one or more of the [listed] grounds and a finding that termination is in the best interest of the child." S.C.Code Ann. § 20–7–1572 (Supp.2003).[3] If the family court finds a statutory ground for termination has been proven, it must then find the best interests of the children would be served by termination. *Id.* Significantly, as our supreme court has noted and the TPR statute provides: "TPR statutes 'must be liberally construed in order to ensure prompt judicial procedures for freeing minor children from the

---

**3.** Section 20–7–1572 was recently amended to include an additional ground for termination; however, this amendment has no applicability in the current case. *See* Act No. 181, 2004 S.C. Acts 1829.

custody and control of their parents by terminating the parent[-]child relationship.' " *Joiner ex rel. Rivas v. Rivas,* 342 S.C. 102, 108, 536 S.E.2d 372, 375 (2000) (quoting S.C.Code Ann. § 20–7–1578 (Supp.1999)).

In the current case, the family court determined that Michael and Sandra abandoned their three children. *See* S.C.Code Ann. § 20–7–1572(7) (Supp.2003). As an alternative ground, the court ruled that Michael's rights should also be terminated because of harm inflicted on the children pursuant to S.C.Code Ann. § 20–7–1572(1) (Supp.2003).[4] After finding statutory grounds for termination, the family court determined it would be in the children's best interest for Sandra and Michael's parental rights to be terminated.

### 1. Abandonment

■ The family court found that Michael and Sandra abandoned their three children. We agree.

■ Section 20–7–1572(7) of the South Carolina Code (Supp.2003) provides in pertinent part, that a family court may order the termination of parental rights upon a finding of abandonment. Section 20–7–490(19) defines abandonment as occurring when "a parent or guardian wilfully deserts a child or wilfully surrenders physical possession of a child without making adequate arrangements for the child's needs or the continuing care of the child." S.C.Code Ann. § 20–7–490 (Supp.2003). The willful standard for termination has been explained as "a question of intent to be determined from the facts and circumstances of each individual case." *South Carolina Dep't of Soc. Servs. v. Headden,* 354 S.C. 602, 610, 582 S.E.2d 419, 423 (2003). Furthermore, parental conduct "which evinces a settled purpose to forego parental duties may fairly be characterized as 'willful' because it manifests a conscious

---

4. Section 20–7–1572(1) of the South Carolina Code provides that a family court may terminate parental rights when:

The child or another child in the home has been harmed as defined in Section 20–7–490, and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months. In determining the likelihood that the home can be made safe, the parent's previous abuse or neglect of the child or another child in the home may be considered[.]"

S.C.Code Ann. § 20–7–1572(1) (Supp.2003).

indifference to the rights of the child to receive support and consortium from the parent." *South Carolina Dep't of Soc. Servs. v. Broome,* 307 S.C. 48, 53, 413 S.E.2d 835, 839 (1992).

We do not think the family court erred in deciding that Michael and Sandra's actions constituted a willful intent to abandon. As noted previously, both Michael and Sandra were aware the grandparents were unable to care for the children for extended periods of time. Michael's mother specifically told them she was leaving Sunday evening for an engagement, both knew she had to work the next day, and both knew that Mr. Truitt was unable to care for the children. Despite this knowledge, neither made an effort to return to the Truitts' and resume care of their children. Although the parents assert they did not have access to a car, both must admit it was their decision to trade the use of the car for drugs. The fact that the car's borrowers did not promptly return the car does not serve to mitigate the parents' failure to find a way home to their children.

The parents also argue that they did not call to check on their children or ask the grandparents for a ride home because the apartment they were staying in did not have a telephone and they feared being arrested if they left the apartment. The mother appears to be saying that by not taking the risk of being arrested on outstanding warrants she was watching out for her children's best interest. This argument, however, is incomprehensible. She knew the grandparents could not provide for her children for an extended period of time and she promised to be back in fifteen minutes for this reason. Clearly, Sandra broke this promise by embarking on a course of illegal behavior that would necessarily take longer than fifteen minutes.

When the parents finally did call and were told the children had been taken into emergency protective custody, neither made an effort to contact DSS in an attempt to regain custody or at the very least to check on their children's welfare. Instead, the parents proceeded to spend the next two months living in hotel rooms and using crack cocaine every other day. In fact, the only thing that prevented the parents from continuing this course of behavior was their arrest on August

14, 2001. Prior to the arrest, the parents' concern with their children was limited to an occasional call to the grandparents.

Michael argues that because a previous court order granted legal custody of two of their children to Sandra, it was not possible for him to abandon them. We are unconvinced by this argument. Michael did have access to the children and he testified that he saw them everyday. While Michael did not have legal custody of the children, he did have the right to supervised visitation even though he did not pursue this right. In fact, he did not make any effort whatsoever to contact his children from the time they were abandoned on June 10, 2001, until his rights were terminated on November 28, 2001. Furthermore, this absence was the result of his decisions, which placed his desires and needs above those of his children. *See Dep't of Soc. Servs. v. Henry,* 296 S.C. 507, 509, 374 S.E.2d 298, 299–300 (1988) (finding "voluntary pursuit of a course of lawlessness resulting in imprisonment, coupled with [the parent's] flagrant indifference towards the children during intervening periods of freedom, manifest[ed] . . . abandonment"). In addition to removing himself from his children's lives, he encouraged Sandra to abandon them as well. Michael's actions do not show concern and attention for his children's welfare; rather, they reflect a conscious indifference to the same.

Although the family court also found Michael's parental rights should be terminated pursuant to section 20–7–1572(1) of the South Carolina Code, (Supp.2003), because we find the trial court was correct in concluding the children were abandoned, we need not address this aspect of the court's ruling. *See* Rule 220(c), SCACR; *Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (appellate court need not address remaining issues when disposition of prior issue is dispositive).

## 2. Best Interests of the Children

In addition to finding Michael and Sandra abandoned their children, the family court concluded that termination of their parental rights would be in the children's best interest. We agree.

Governmental intervention in a parent-child relationship is of great moment and concern. The United States Supreme Court has held that "a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " *Lassiter v. Dep't of Soc. Servs. of Durham County, N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). Society's fundamental relational basis is the family, and a government is wise that respects its importance. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.") (citation omitted). However, the primary goal must be to protect the children's best interests. *Hooper v. Rockwell*, 334 S.C. 281, 295, 513 S.E.2d 358, 366 (1999).

In this case, reversing the family court would return the children to a father who repeatedly deserted his children to fulfill his drug addiction, failed to fulfill his obligations under a previous court order, and encouraged the mother to desert her children. It would also return the children to a mother who deserted her children for more than four months, and has a drug addiction, a criminal history, and remained in a relationship with a father who previously neglected their children. To affirm the decision is to free the children from the bonds of foster care and allow them the opportunity to be adopted into a stable and nurturing home.

█ Although the preference of the law is to return children to their parents, the presumption that a natural parent is a fit parent must be balanced against reality. *See Troxel v. Granville*, 530 U.S. 57, 69, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (noting the traditional *presumption* that a *fit* parent will act in the best interests of a child) (emphasis added). The United States Supreme Court has stated that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family...." *Id.* at 68, 120 S.Ct.

2054 (citation omitted). In this case, Sandra and Michael failed to care for their children. The reality we confront today is of a mother and father who have demonstrated a gross indifference to the welfare of their children. *See South Carolina Dep't of Soc. Servs. v. Ledford,* 357 S.C. 371, 377, 593 S.E.2d 175, 177 (Ct.App.2004) ("a parent's responsibility extends beyond making initial arrangements for his or her child while the parent is away; the statute requires that the parent make adequate arrangements for the child's *continuing care.*"). As such, we find it is in the children's best interest to terminate Michael and Sandra's parental rights.

## CONCLUSION

Accordingly, we find the family court did not err in ruling Michael and Sandra abandoned the children. We also agree with the family court that termination of their parental rights is in the children's best interest.

**AFFIRMED.**[5]

GOOLSBY and ANDERSON, JJ., concur.

---

5. This court would also like to acknowledge and commend defense counsel for the thorough and zealous representation of their court appointed clients. As the late Judge Bell once noted, such representation is "in the best tradition of the legal profession." *Leone v. Dilullo,* 294 S.C. 410, 414, 365 S.E.2d 39, 41 (Ct.App.1988).